## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**PUBLIC SERVICE COMPANY**
**OF NEW MEXICO,**
        **Plaintiff,**

**vs.**                                                    **No. 15 CV 501 JAP/CG**

**APPROXIMATELY 15.49 ACRES OF LAND**
**IN MCKINLEY COUNTY, NEW MEXICO;**
**NAVAJO NATION;**
**NAVAJO TRIBAL UTILITY AUTHORITY;**
**CONTINENTAL DIVIDE ELECTRIC COOPERATIVE, INC.;**
**TRANSWESTERN PIPELINE COMPANY, LLC;**
**CITICORP NORTH AMERICA, INC.;**
**CHEVRON USA INC., as successor in interest to Gulf Oil Corp.;**
**HARRY HOUSE, Deceased;**
**LORRAINE BARBOAN, also known as, LARENE H. BARBOAN;**
**PAULINE H. BROOKS;**
**BENJAMIN HOUSE, also known as, BENNIE HOUSE;**
**ANNIE H. SORRELL, also known as, ANNA H. SORRELL;**
**MARY ROSE HOUSE, also known as, MARY R. HOUSE;**
**DOROTHY HOUSE, also known as, DOROTHY W. HOUSE;**
**LAURA H. LAWRENCE, also known as, LAURA H. CHACO;**
**LEO HOUSE, JR.; JONES DEHIYA; NANCY DEHEVA ESKEETS;**
**JIMMY A. CHARLEY, also known as, JIM A. CHARLEY;**
**MARY GRAY CHARLEY, also known as, MARY B. CHARLEY;**
**BOB GRAY, Deceased, also known as, BOB GREY;**
**CHRISTINE GRAY BEGAY, also known as, CHRISTINE G. BEGAY;**
**THOMAS THOMPSON GRAY, also known as, THOMAS GREY;**
**JIMMIE GREY, also known as, JIMMIE GRAY;**
**LORRAINE SPENCER;**
**MELVIN L. CHARLES, also known as, MELVIN L. CHARLEY;**
**MARLA L. CHARLEY, also known as, MARLA CHARLEY;**
**KALVIN A. CHARLEY; LAURA A. CHARLEY;**
**HELEN M. CHARLEY; MARILYN RAMONE; WYNEMA GIBERSON;**
**IRENE WILLIE, also known as, IRENE JAMES WILLIE;**
**EDDIE MCCRAY, also known as, EDDIE R. MCCRAE;**
**ETHEL DAVIS, also known as, ETHEL B. DAVIS;**
**CHARLEY JOE JOHNSON, also known as, CHARLEY J. JOHNSON;**
**WESLEY E. CRAIG; HYSON CRAIG; NOREEN A. KELLY;**
**ELOUISE J. SMITH;**
**ELOUISE ANN JAMES, also known as, ELOUISE JAMES WOOD, also known as,**
**ELOISE ANN JAMES, also known as, ELOUISE WOODS;**

1

**LEONARD WILLIE;**
**ALTA JAMES DAVIS, also known as, ALTA JAMES;**
**ALICE DAVIS, also known as, ALICE D. CHUYATE;**
**PHOEBE CRAIG, also known as, PHOEBE C. COWBOY;**
**NANCY JAMES, also known as, NANCY JOHNSON;**
**BETTY JAMES, Deceased;**
**LINDA C. WILLIAMS, also known as, LINDA CRAIG-WILLIAMS;**
**GENEVIEVE V. KING; LESTER CRAIG; SHAWN STEVENS;**
**FABIAN JAMES;**
**DAISY YAZZIE CHARLES, also known as,**
**DAISY YAZZIE, also known as, DAISY J. CHARLES;**
**ROSIE YAZZIE, Deceased;**
**KATHLEEN YAZZIE JAMES, also known as, CATHERINE R. JAMES;**
**VERNA M. CRAIG;**
**JUANITA SMITH, also known as, JUANITA R. ELOTE;**
**ALETHEA CRAIG, SARAH NELSON, LARRY DAVIS, JR.;**
**BERDINA DAVIS; MICHELLE DAVIS; STEVEN MCCRAY;**
**VELMA YAZZIE; GERALDINE DAVIS;**
**LARRISON DAVIS, also known as, LARRISON P. DAVIS;**
**ADAM MCCRAY; MICHELLE MCCRAY;**
**EUGENIO TY JAMES; LARSON DAVIS; CORNELIA A. DAVIS;**
**CELENA DAVIS, also known as, CELENA BRATCHER;**
**FRANKIE DAVIS;**
**GLEN CHARLES CHARLESTON, also known as, GLEN C. CHARLESTON;**
**VERNA LEE BERGEN CHARLESTON, also known as, VERNA L. CHARLESTON;**
**VERN CHARLESTON;**
**GLENDA BENALLY, also known as, GLENDA G. CHARLESTON;**
**KELLY ANN CHARLESTON, also known as, KELLY A. CHARLESTON;**
**SHERYL LYNN CHARLESTON, also known as, SHERYL L. CHARLESTON;**
**SPENCER KIMBALL CHARLESTON, JR., Deceased;**
**EDWIN ALLEN CHARLESTON, also known as, EDWIN A. CHARLESTON;**
**CHARLES BAKER CHARLESTON, also known as, CHARLES B. CHARLESTON;**
**SAM MARIANO; JORGE ADRIAN ORTEGA-GALLEGOS;**
**Unknown owners, Claimants and Heirs of the Property Involved,**
**JORGE ADRIAN ORTEGA-GALLEGOS, Unknown Heirs of Harry House, Deceased,**
**JORGE ADRIAN ORTEGA-GALLEGOS, Unknown Heirs of Bob Gray (Bob Grey),**
**Deceased, Unknown Heirs of Betty James, Deceased, Unknown Heirs of Rosie C. Yazzie,**
**Deceased, Unknown Heirs of Spencer Kimball Charleston, Jr. (Spencer K. Charleston),**
**Deceased,**
**ESTATE OF ROSIE C. YAZZIE, Deceased,**
**ESTATE OF SPENCER K. CHARLESTON, Deceased,**
**UNITED STATES OF AMERICA,**
**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
**UNITED STATES DEPARTMENT OF THE INTERIOR,**
      **Defendants.**

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO DISMISS THE NAVAJO NATION**
**AND ALLOTMENT NUMBERS 1160 AND 1392**

On June 13, 2015, Public Service Company of New Mexico (PNM) filed a COMPLAINT

FOR CONDEMNATION (Doc. No. 1) seeking a perpetual easement for electrical transmission

lines. (*See* Complaint Exs. 2-6; ¶ 37.) PNM brought this action to condemn a perpetual easement

over five parcels of land owned by members of the Navajo Nation (Nation): (1) Allotment 1160,

(2) Allotment 1204, (3) Allotment 1340, (4) Allotment 1392, and (5) Allotment 1877 (together,

the Five Allotments). (*Id.*) The Nation owns an undivided 13.6 % interest in Allotment 1160 and

an undivided .14 % interest in Allotment 1392 (together, the Two Allotments). (*Id.*)

In the MOTION TO DISMISS THE NAVAJO NATION AND ALLOTMENT

NUMBERS 1160 AND 1392 (Doc. No. 32) (the Motion), the Nation argues that this Court lacks

subject matter jurisdiction and asks the Court to dismiss it as a defendant because, as a sovereign

nation, it is immune from suit. In addition, the Nation asks the Court to dismiss the Two

Allotments because under Fed. R. Civ. P. 19, the Nation is an indispensable party that cannot be

joined. Defendants Lorraine J. Barboan, Laura H. Chaco, Benjamin A. House, Mary R. House,

Annie H. Sorrell, Dorothy W. House,[1] Jones Dehiya,[2] Kalvin Charley, Mary B. Charley, Melvin

L. Charley, Marla L. Charley, Christine G. Begay, Jimmie Gray, Thompson Grey, Bob Grey,[3]

Leonard Willie, Irene Willie, Charley Johnson, Eloise J. Smith, Shawn Stevens,[4] Glen C.

Charleston, and Glenda G. Charleston[5] (together, the 22 Defendants) have joined the Motion.[6]

---

[1] Lorraine J. Barboan, Laura H. Chaco, Benjamin A. House, Mary R. House, Annie H. Sorrell, and Dorothy W.
House are owners of fractional interests in Allotment 1160.
[2] Jones Dehiya is an owner of a fractional interest in Allotment 1204.
[3] Kalvin Charley, Mary B. Charley, Melvin L. Charley, Marla L. Charley, Christine G. Begay, Jimmie Gray,
Thompson Grey, and Bob Grey are owners of fractional interests in Allotment 1340.
[4] Leonard Willie, Irene Willie, Charley Johnson, Eloise J. Smith, and Shawn Stevens are owners of fractional
interests in Allotment 1392.
[5] Glen C. Charleston and Glenda G. Charleston are owners of fractional interests in Allotment 1877.
[6] Despite the joinder of the 22 Defendants in the Motion, the other three allotments will not be dismissed.

*See* NOTICE OF DEFENDANTS' JOINDER IN NAVAJO NATION'S MOTION TO DISMISS

(Doc. No. 33) (Notice of Joinder). The United States also agrees that the Nation and the Two

Allotments should be dismissed from this action. *See* ANSWER OF THE UNITED STATES

(Doc. No. 25); and RESPONSE TO THE NAVAJO NATIONS [SIC] MOTION TO DISMISS

(Doc. No. 44).

PNM opposes the Motion. *See* PLAINTIFF PUBLIC SERVICE COMPANY OF NEW

MEXICO'S RESPONSE IN OPPOSITION TO DEFENDANT NAVAJO NATION AND 22

DEFENDANTS' MOTION TO DISMISS THE NAVAJO NATION AND ALLOTMENT

NUMBERS 1160 AND 1392 (Doc. No. 39) (the Response), and the Nation has filed a Reply

brief. *See* REPLY IN RESPONSE IN OPPOSITION TO MOTION TO DISMISS (Doc. No. 45)

(the Reply).

After the Motion was fully briefed, PNM filed its FIRST AMENDED COMPLAINT

FOR CONDEMNATION (Doc. No. 49) (FAC) adding the United States Department of Health

and Human Services (HHS) and the United States Department of the Interior (DOI) as

defendants because "records of the United States of America, Department of the Interior, Bureau

of Indian Affairs ("BIA") relating to the Property indicate that the United States, HHS, and DOI,

including, but not limited to, their respective constituent agencies the United States Public Health

Service and the BIA, may have other interests in or encumbrances affecting the Property."[7] (FAC

¶ 23.)[8] Even though the Motion was filed prior to the FAC, the Court will rule on the Motion as

though it applies to the FAC. On October 27, 2015, the 22 Defendants filed their ANSWER TO

---

[7] Under Rule 71.1, a plaintiff seeking to condemn property may amend its complaint without leave of the court and
at any time before the trial on compensation. Fed. R. Civ. P. 71.1 (f).
[8] In its answer, the United States Department of Health and Human Services asserts that it has sovereign immunity
from this suit. *See* ANSWER OF HEALTH AND HUMAN SERVICE TO THE AMENDED COMPLAINT (Doc.
No. 97) at 7.

FIRST AMENDED COMPLAINT FOR CONDEMNATION (Doc. No. 95) asserting a

counterclaim against PNM for trespass.[9]

## I.        BACKGROUND

### A.        ORIGINAL EASEMENT

On April 8, 1960, the BIA granted to PNM a fifty-year right of way easement (the

Original Easement) authorizing PNM to construct, maintain, and operate an electric transmission

line in northwestern New Mexico. (FAC ¶¶ 27-28.) During the 1960's, PNM constructed a 115-

Kilovolt electric transmission line that connected PNM's Ambrosia substation, located north of

Grants, New Mexico, to PNM's Ya-Ta-Hey substation, located west of Gallup, New Mexico.

The transmission line, known as the "AY Line," is a crucial component of PNM's system for the

transmission of electricity to this area of New Mexico. (FAC ¶ 30.) The Navajo Nation and its

members benefit from the support that the AY Line provides to PNM's electricity distribution

system. (*Id.*)

In 2009, in anticipation of the April 2010 expiration of the Original Easement, PNM

sought the consent of the Allotment owners to a renewal of the Original Easement. (FAC ¶ 31.)

On November 3, 2009, PNM, having obtained written consent from the requisite percentage of

Allotment owners, submitted its renewal application to the BIA. (FAC ¶¶ 32-33.) In June 2014,

however, counsel for some of the owners notified the BIA and PNM that the owners had revoked

their earlier written consents. (FAC ¶ 34.) In January 2015, the BIA notified PNM that the

revocations of consent precluded the BIA from approving the application. (FAC ¶ 35.) During

---

[9] On September 18, 2015, the 22 Defendants filed a trespass suit against PNM and the United States, as a nominal defendant, in the United States District Court for the District of New Mexico. *See Barboan et al. v. Public Service Co. of N.M.*, Case No. 15 CV 826 LF/KK. The United States has moved to dismiss the case. *Id.* (Doc. No. 14).

the ensuing months, PNM attempted in good faith, though unsuccessfully, to obtain the necessary consents to renew the Original Easement.[10] (FAC ¶ 36.)

B.      HISTORY OF ALLOTTED LANDS

In the late nineteenth century, Congress initiated a program allowing the division of communal Indian property into individually-owned property. *Babbitt v. Youpee*, 519 U.S. 234, 237 (1997). Under the Indian General Allotment Act of 1887 (the General Allotment Act), ch. 119, 24 Stat. 388, portions of Indian reservation land were transferred, or allotted, to individual tribal members. *Id.* Land not allotted to individual tribal members was opened to non-Indians for settlement. *Babbitt*, 519 U.S. at 237. However, the United States continued to hold fee title to allotted lands in trust for the individual Indian allottees or the individual allottees owned the land subject to restrictions on alienation. *Id.*; *State of Minnesota v. United States*, 305 U.S. 382, 386 (1939). On the death of the allottee, the land descended according to the laws of the State or Territory where the land was located. 24 Stat. 389. In 1910, Congress provided that allottees could devise their interests in allotted land. Act of June 25, 1910, ch. 431, § 2, 36 Stat. 856, codified as amended, 25 U.S.C. § 373.

Over time, the division of title to individual allottees "proved disastrous for the Indians." *Hodel v. Irving*, 481 U.S. 704, 707 (1987) (describing how parcels became splintered with multiple owners, some parcels having hundreds of owners). In 1934, Congress passed the Indian Reorganization Act of 1934, 25 U.S.C. §§ 450 et seq., which ended further allotment of Indian land. However, interests in lands already allotted continued to be divided over the generations. *Babbitt*, 519 U.S. at 238.

---

[10] The FAC does not allege whether PNM sought the Nation's consent to renew the Original Easement. PNM's application for renewal is still pending at the BIA. *See* FAC ¶ 35.

C.      CONDEMNATION OF ALLOTTED LANDS

As part of the General Allotment Act, Congress also allowed condemnation of allotted lands. *See* 25 U.S.C. § 357. The United States Supreme Court has held that, as fee owner of allotted lands, the United States is an indispensable party to condemnation proceedings under § 357. *State of Minnesota*, 305 U.S. at 386–388. *See also Town of Okemah, Okla. v. United States*, 140 F.2d 963, 965 (10th Cir. 1944). The Supreme Court reasoned that in authorizing the condemnation of allotted lands, Congress "conferred by implication permission to sue the United States." *State of Minnesota*, 305 U.S. at 388. Consequently, a condemnation action under § 357 must be filed in federal court, where the United States has consented to be sued. *Id.* at 388–89.

D.      GRANTS OF RIGHTS OF WAY

In the Indian Right of Way Act of February 5, 1948, (the 1948 Act), Congress authorized the Secretary of the Interior (Secretary) to grant rights of way across allotted lands with the consent of allottees holding a majority of the ownership interests. 25 U.S.C. §§ 323–328. The Secretary could also grant rights of way across land held in trust for Indian tribes with the "consent of the proper tribal officials." 25 U.S.C. § 324. In exchange, the allottees and the tribes must be paid compensation in an amount the Secretary finds to be just. 25 U.S.C. § 325. Section 328 provides that the Secretary may promulgate regulations to administer §§ 323–328. The regulations are codified in 25 C.F.R. §§ 169.1–169.28.[11]

The Tenth Circuit has held that 25 U.S.C. §357 and §§ 323–328 provide independent, alternative methods for a state-authorized condemnor to obtain a right of way over allotted lands. *Yellowfish v. City of Stillwater, Okla.,* 691 F.2d 926, 930–31 (10th Cir. 1982), *cert. denied,* 461

---

[11] *See generally* Todd Miller, Easements on Tribal Sovereignty, 26 Am. Indian L. Rev. 105, 121–25 (2002) (hereinafter Miller). "The only way to obtain these easements [over tribal lands] is by the procedures set out in [§§ 323–328] and detailed in the regulations. This requires approval from the Secretary of Interior and written consent from the appropriate tribal officials." *Id.*

U.S. 927 (1983) (rejecting the argument that the 1948 Act impliedly repealed Section 357). *See also Nebraska Public Power Dist. v. 100.95 Acres of Land in Thurston County, Hiram Grant,* 719 F.2d 956, 961 (8th Cir. 1983) (hereinafter, *NPPD*) (holding that federal law provides for the option of condemnation of an individual allottee's interest under 25 U.S.C. § 357 if the condemning authority is unable to obtain a voluntary easement).

     E.     THE INDIAN LAND CONSOLIDATION ACT

On January 12, 1983, Congress passed the Indian Land Consolidation Act (ILCA), P.L. 97-459, 96 Stat. 2515, codified as amended in 25 U.S.C. §§ 2201–2221, in an attempt to further ameliorate the problem of "fractionated ownership of Indian lands." *Hodel*, 481 U.S. at 709. Under the ILCA, "any tribe, acting through its governing body, is authorized, with the approval of the Secretary to adopt a land consolidation plan providing for the sale or exchange of any tribal lands or interest in lands for the purpose of eliminating undivided fractional interests in Indian trust or restricted lands or consolidating its tribal landholdings . . ." 25 U.S.C. § 2203. The Secretary was authorized to acquire fractional interests from allotment owners and hold those interests in trust for the tribe. 25 U.S.C. §§ 2209; 2212. In the amendments to ILCA enacted in 2000, Congress provided,

> Subject to the conditions described in subsection (b)(1) of this section, an Indian tribe receiving a fractional interest . . . may, as a tenant in common with the other owners of the trust or restricted lands, lease the interest, sell the resources, consent to the granting of rights-of-way, or engage in any other transaction affecting the trust or restricted land authorized by law.

25 U.S.C. § 2213(a). Section 2213(b)(1) states that, as to allotted land which the Secretary has purchased in trust for a tribe, the Secretary has a lien on any revenue accruing to the interest of a tribe in allotted land, "until the Secretary provides for the removal of the lien . . ." 25 U.S.C.

2213(b)(1).[12] And, "until the Secretary removes a lien from an interest in land . . . the Secretary

may approve a transaction covered under this section on behalf of an Indian tribe." 25 U.S.C. §

2213(b)(2)(B). Under § 2213(c), if a tribe does not consent to a lease or other agreement

affecting its interest in allotted land, the Secretary may enter into the lease or agreement, but "the

Indian tribe shall not be treated as being a party to the lease or agreement. Nothing in this section

(or in the lease or agreement) shall be construed to affect the sovereignty of the Indian tribe." 25

U.S.C. § 2213(c)(1) and (2).

## II.     STANDARD OF REVIEW

### A.     SOVEREIGN IMMUNITY OF INDIAN TRIBES

"Indian tribes are unique aggregations possessing attributes of sovereignty over both their

members and their territory . . .; they are 'a separate people' possessing 'the power of regulating

their internal and social relations. . . .' " *United States v. Mazurie,* 419 U.S. 544, 557 (1975)

(citations omitted). The Tenth Circuit Court of Appeals described Indian sovereign immunity:

> It is well-established that "Indian tribes are distinct, independent political
> communities, retaining their original natural rights in matters of local self-
> government. Although no longer possessed of the full attributes of sovereignty,
> they remain a separate people, with the power of regulating their internal and
> social relations." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55 . . . (1978)
> (citations and quotations omitted). As sovereign powers, Indian tribes are immune
> from suit absent congressional abrogation or clear waiver by the tribe. *Kiowa
> Tribe of Okla. v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 753 . . . (1998).

*Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1148 (10th Cir. 2012).

Tribal sovereign immunity is subject to the superior and plenary control of Congress.

*Santa Clara Pueblo*, 436 U.S. at 57. Congress may abrogate tribal immunity, but Congress must

---

[12] Under § 2213, the Secretary may remove a lien if the Secretary finds that (1) the costs of administering the
interest equal or exceed the revenue; (2) it will take an unreasonable period of time for the parcel to generate
revenue that equals the purchase price; (3) a subsequent decrease in value of the parcel makes it unlikely to generate
revenue that equals the purchase price in a reasonable time; or (4) payment of the purchase price has been tendered
into the Acquisition Fund created under § 2215.

clearly express its intent to do so. *Michigan v. Bay Hills Indian Community*, 134 S.Ct. 2024, 2031 (2014). And courts will not lightly assume Congress "in fact intends to undermine Indian self-government." *Id.* at 2031–32. Alternatively, a tribe may waive sovereign immunity, but "a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Santa Clara Pueblo*, 436 U.S. at 58-59 (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976) *and United States v. King*, 395 U.S. 1, 4, (1969)).

### B.     FEDERAL CONDEMNATION LAW

Indian lands are generally governed by federal law. *NPPD*, 719 F.2d at 961. PNM asserts authority to condemn under Section 3 of the Act of March 3, 1901, 25 U.S.C. § 357:

> Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee.

An "allotment" is a parcel of land awarded to an individual tribal member from a common holding. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 142 (1972) (citation omitted) (noting that "allotment" is a term of art in Indian law).

### C.     FEDERAL PROCEDURAL LAW

Even though § 357 allows condemnation of allotted lands under the laws of the State where the lands are located, the Court must follow federal procedural law. *Alliance Pipeline L.P. v. 4.360 Acres of Land, More or Less,* 746 F.3d 362, 367 (8th Cir. 2014) (stating that federal rules displace state procedural law in all federal condemnation proceedings."). Federal Rule of Civil Procedure 71.1 provides, "[t]hese rules govern proceedings to condemn real and personal property by eminent domain, except as this rule provides otherwise." Fed. R. Civ. P. 71.1(a). Rule 71.1 requires that, "[w]hen an action commences, the plaintiff need join as defendants only those persons who have or claim an interest in the property and whose names are then known.

10

But before any hearing on compensation, the plaintiff *must add as defendants* all those persons who have or claim an interest and whose names have become known or can be found by a reasonably diligent search of the records, . . ." Fed. R. Civ. P. 71.1(c)(1) (emphasis added). Thus, all persons having any interest in the property to be condemned must be joined as defendants. 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Fed. Prac. & Proc. § 3045 (2d ed. 1997). As the owner of fee title to the Five Allotments, the United States must be joined in a condemnation action as well.[13] Rule 71.1 further provides, "[a]t any time before compensation has been determined and paid, the court may, after a motion and hearing, dismiss the action as to a piece of property." Fed. R. Civ. P. 71.1(i)(1)(C).[14] "The court may at any time dismiss a defendant who was unnecessary or improperly joined." Fed. R. Civ. P. 71.1(i)(2).

D.     SUBJECT MATTER JURISDICTION

The Nation argues that the Court lacks subject matter jurisdiction over this action because the Nation is immune from suit in this Court. *See* Fed. R. Civ. P. 12(b)(1).[15] In ruling on the Motion to dismiss for lack of subject matter jurisdiction, the Court must accept the allegations in the FAC as true and construe the allegations in favor of PNM. *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) (citing *Riggs v. City of Albuquerque,* 916 F.2d 582, 584 (10th Cir. 1990)). The Nation asserts that since it is immune from suit, this Court also lacks jurisdiction over the Two Allotments in which the Nation owns fractional interests and, therefore, the Two Allotments should be dismissed as well. The Nation contends that Rule 19 on

---

[13] *See* ANSWER OF THE UNITED STATES (Doc. No. 25) ¶ 23 (admitting that the United States holds in trust the Five Allotments for the benefit of the individual allottees and for the Nation).

[14] Because the Court will dismiss the Two Allotments on the basis of a legal issue after full briefing, there is no need for a hearing.

[15] "Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: . . . lack of subject-matter jurisdiction[.]" Fed. R. Civ. P. 12(b)(1).

joinder of parties should guide the Court's analysis in determining whether to dismiss the Two

Allotments.

### E.        JOINDER OF PARTIES

Rule 19 provides,

> **(a) Persons Required to Be Joined if Feasible.**
> **(1)** *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligation because of the interest.
> . . .
> **(b) When Joinder Is Not Feasible.** If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
> (1)      the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2)      the extent to which any prejudice could be lessened or avoided by:
>          (A)      protective provisions of the judgment;
>          (B)      shaping the relief; or
>          (C)      other measures;
> (3)      whether a judgment rendered in the person's absence would be adequate; and
> (4)      whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

Fed. R. Civ. P. 19(a) and (b).

To summarize, the Nation contends that since it is immune from suit, the Court should

find "in equity and good conscience" that the action should not proceed against the Two

Allotments. PNM counters that the Nation is not immune from this action; however, if the Court

dismisses the Nation, the action should proceed as to the Two Allotments because the Nation is

not an indispensable party under Rule 19.

III.     ANALYSIS

A.     PLAIN LANGUAGE OF § 357

In its Response, PNM, citing *United States v. Clarke*, 445 U.S. 253 (1980) and *NPPD*, argues that the plain language of 25 U.S.C. § 357 shows a Congressional intent to abrogate tribal sovereign immunity from condemnation suits. (Resp. at 7.) In *Clarke*, the Supreme Court determined that the plain meaning of the term "condemnation" in § 357 was "a judicial proceeding instituted for the purpose of acquiring title to private property and paying just compensation for it," and not an action against a state or local government for inverse condemnation. *Id.* at 258. Section 357 did not allow condemnation of allotted land by physical occupation. *Id.* In *NPPD*, the Eighth Circuit Court of Appeals concluded that § 357 allowed condemnation of allotted land whether located inside or outside reservation borders, noting "[w]e cannot ignore the plain meaning of the statute, which provides simply for condemnation of 'allotted land' without regard to its location." 719 F.2d at 961.

PNM contends that following the lead of *Clarke* and *NPPD*, this Court should find that the plain meaning of "lands allotted," as used in § 357, includes all allotted land, "without regard to its" ownership. In essence, PNM asserts that "allotted lands" in § 357 means lands previously allotted to individual Indians "regardless of which persons or entities own fractional interests" at the time of the condemnation. (Resp. at 7.) However, the court in *Clarke* did not take an expansive view of the term "condemnation," and the court in *NPPD* expressly refused to hold that allotted lands owned by tribes, which it determined were "tribal lands," were subject to condemnation under § 357. 719 F.2d at 962 (holding that under § 357 a public utility could not

condemn allotted land in which individual allottees had a life estate but a tribe held a reversionary interest).[16]

Despite PNM's contention that § 357's plain language allows condemnation against allotments owned by tribes, the Court concludes that the wording "[l]ands allotted *in severalty to Indians* may be condemned" illustrates a singular Congressional focus on allotted land owned by individual tribal members. 25 U.S.C. § 357 (emphasis added). *Cf. Carcieri v. Salazar*, 555 U.S. 379, 387–88 (2009) (noting that the term "Indian" in 25 U.S.C. § 465 means an individual member of a recognized Indian tribe).[17] The Nation cannot be considered as an owner of "lands allotted in severalty to Indians."

In *Eastern Band of Cherokee Indians v. Griffin*, the court dealt with a different right of way statute, 25 U.S.C. § 311, which allowed the Secretary to grant rights of way for highways over individually allotted lands and over reservations, without tribal consent. 502 F. Supp. 924, 929 (W.D. N.C. 1980). In response to tribal members' argument that instead of a consensual right of way, the land had been condemned without just compensation, the court commented,

---

[16] In its Response, PNM argues that the court in *NPPD* incorrectly determined that any portion of allotted land transferred from individual allottees to a tribe became "tribal land." The court in *NPPD* used the definition of "tribal land" in the regulations promulgated under the 1948 Act, 25 U.S.C. §§ 323–328, codified in 25 C.F.R. §§ 169.1-169.28. "Tribal land" is defined as "land or any interest therein, title to which is held by the United States in trust for a tribe, or title to which is held by any tribe subject to Federal restrictions against alienation or encumbrance . . ." 25 C.F.R. § 169.1(d). PNM argues that the regulations should be applicable only to the subject of the 1948 Act, which is "rights-of-way over and across tribal land, individually owned land and Government owned land." 25 C.F.R. § 169.2. PNM maintains that these regulations should not apply to condemnation actions. However, other courts have followed the holding in *NPPD*. *See, e.g., United States v. Pend Oreille Public Util. Dist. No. 1*, 28 F.3d 1544, 1552 (9th Cir. 1994) (citing case and noting that § 357 "does not apply to land held in trust for the Tribe."); *Bear v. United States*, 611 F. Supp. 589, 599 (D. Nebr. 1985) (citing case and noting that treaty lands cannot be condemned under § 357); and *Houle v. Central Power Elec. Co-op, Inc.*, No. 4:09–cv–021, 2011 WL 1464918, *6 (D. N.D. Mar. 24, 2011) (unreported) (citing case and stating that § 357 condemnation claims may be brought against individual allotment owners). Moreover, the Court agrees with the reasoning in *NPPD* that § 357 does not allow condemnation of lands owned by tribes, and the Court also relies on the plain language of § 357 and its distinct application to lands "allotted in severalty to Indians."

[17] Under the General Allotment Act, the word "Indian" is used to denote an individual, who is referred to as an "allottee" or as "he" or "she." *See, e.g.,* 25 U.S.C. §§ 334 (allotment to Indians not residing on reservations), 336 (allotments to Indians making settlement), 348 (patents to be held in trust), 349 (fee patents issued by Secretary "whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs.").

"Congress provided for condemnation proceedings under . . . Section 357, but limited such proceedings to lands which have been allotted to individual Indians. This section does not apply . . . because the lands in question . . . have never been allotted to individual Indians as that term is defined by Congress and the courts." 502 F. Supp. at 930. The Court concludes that under its plain language, § 357 only allows condemnation of allotted lands owned by individual tribal members, and § 357 does not expressly apply to allotted lands acquired by Indian tribes.

B.      LACK OF AMENDMENT TO § 357

PNM further contends that Congress' enactment of the ILCA, which allows tribes to obtain interests in allotted land, without any modification of § 357, evidences Congressional intent to allow condemnation actions against allotted land owned by tribes. PNM presents several arguments concerning the history of § 357 and the ILCA in support of its contention.

1.      Extending Supreme Court's implied abrogation of the United States' sovereign immunity in § 357

PNM first points to the holding in *State of Minnesota*, in which the Supreme Court commented that § 357 implicitly waived the sovereign immunity of the United States for condemnation actions in federal court. In that case, Minnesota sued for condemnation in state court under § 357 to build a highway over nine individually-owned allotments located on the Grand Portage Indian Reservation. 305 U.S. at 383. The United States specially appeared, removed the case to federal court, and moved to dismiss for lack of jurisdiction due to sovereign immunity. *Id.* The district court denied the motion reasoning that the United States was not a necessary party, "since consent . . . to bring these proceedings against the Indian allottees has been expressly granted and given by the United States to the State of Minnesota, pursuant to 25 [U.S.C.] Section 357[.]" *Id.* at 384. The Eighth Circuit Court of Appeals reversed the district court's holding. *United States v. State of Minnesota*, 95 F.2d 468 (8th Cir. 1938).

15

The Supreme Court determined that the United States was an indispensable party to the condemnation proceedings because it holds fee title to the allotments. 305 U.S. at 388. In response to the argument that § 357 authorized state court suits against the United States, the Supreme Court commented, "[i]t is true that authorization to condemn confers by implication permission to sue the United States. But Congress has provided generally for suits against the United States in the federal courts." *Id.* Because this suit was in state court, the Court upheld the dismissal. *Id.* at 389. The Supreme Court noted that if the action had been initiated in federal court, "it would have had jurisdiction." *Id.*

Courts have cited *State of Minnesota* as recognizing Congress' implicit abrogation of federal sovereign immunity from § 357 suits in federal court. *See, e.g., Town of Okemah*, 140 F.2d at 965 (citing *State of Minnesota* and concluding that "Section 357, *supra*, by authorizing condemnation, conferred by implication permission to sue the United States."). According to PNM, this same reasoning should apply to find that Congress impliedly abrogated the Nation's sovereign immunity in § 357. As the Nation points out, however, no court has concluded this, and subsequent cases citing *State of Minnesota* do so without further analysis. *See Jachetta v. United States,* 653 F.3d 898, 907 (9th Cir. 2011) (citing *State of Minnesota* and stating, "[b]ecause § 357 permits condemnation actions that cannot effectively proceed absent the United States, § 357 waives the government's sovereign immunity."); and *Prince*, *infra* (noting the holding as to § 357, but declining to find implied permission to sue the United States under another provision of the General Allotment Act).

By contrast, the Tenth Circuit has suggested that the Supreme Court's implied waiver in *State of Minnesota* conflicts with the requirement that federal immunity must be unequivocally waived. In *Prince v. United States*, the Tenth Circuit upheld the dismissal of a partition action

16

against the United States and individual Indian allottees. 7 F.3d 968, 970 (10th Cir. 1993). The

plaintiff, a non-Indian, owned an undivided 23/378th fee interest in the land, and the remaining

percentage of the allotted land was owned by the United States in trust for individual members of

the Comanche Indian tribe. *Id.* The plaintiff sued in state court for partition of the land in kind

under 25 U.S.C. § 348. *Id.* at 969. The United States removed the action to federal court, and

moved to dismiss for lack of jurisdiction due to sovereign immunity. *Id.* The plaintiff asked the

court to follow the holding in *State of Minnesota* and find that § 348, applying state partition

laws to allotments, also impliedly waived United States' immunity from state court partition

actions. However, the Tenth Circuit distinguished *State of Minnesota*, and held that "because [25

U.S.C.] § 348 does not provide jurisdiction to the state court to entertain this partition action, a

waiver of sovereign immunity cannot be implied from this provision." *Id.* at 970.

As these cases illustrate, the holding in *State of Minnesota* has been narrowly applied to

allow suits under § 357 against the United States in federal court that involve individual

allotments. In addition, the Tenth Circuit refused to expand the holding to allow suits against the

United States in state court under § 348. Hence, this Court will not expand *State of Minnesota* to

find an implied abrogation of the Nation's sovereign immunity in § 357. It bears repeating that

the Nation's sovereign immunity must be abrogated by unequivocal statutory language.

### 2.    The ILCA's effect on § 357

Next PNM argues that the Congress' failure to amend § 357, after enacting the ILCA,

indicates that Congress intended to allow condemnation actions to proceed even though tribes

obtained allotments. In particular, PNM points to amendments to ILCA in 2000 in which

Congress limited tribal power over some transactions involving allotted lands by allowing the

Secretary to approve transactions without a tribe's consent. 25 U.S.C. § 2213 (b)(2)(B) and (c).

17

Congress treated non-consenting tribes as non-parties to those transactions, and Congress explicitly provided that neither the statute nor the transaction agreement could "affect the sovereignty of any Indian tribe." 25 U.S.C. § 2213(c)(2). PNM contends that this limitation of tribal power in the ILCA and the reinstatement of sovereign immunity in non-consensual transactions, without an amendment to § 357, shows "Congress apparently understood that (a) Section 357 already operated as a waiver or abrogation of tribal sovereign immunity against condemnation of allotted lands, or (b) a tribe's acquisition of fractional interests pursuant to ICLA [sic] would necessarily constitute the tribe's own waiver of any sovereign immunity against condemnation of allotted lands." (Resp. at 8.) The Court does not find either of these arguments persuasive.

There is no mention of condemnation in the ILCA and there is no basis on which to conclude that Congress understood that the ILCA would open up tribes to condemnation actions under § 357 after tribes acquired allotted lands. PNM asks the Court to consider the language in 25 U.S.C. § 2213(c)(2) as an admission by Congress that tribal sovereignty could be affected by allowing the Secretary to approve a transaction without the consent of a tribe. Although it is not clear in the Response, PNM seems to assert that Congress must have thought the sovereign immunity language in § 2213(c)(2) was necessary because courts might find that Congress abrogated a non-consenting tribe's immunity by allowing a transaction without a tribe's consent. The Court does not accept the premise that Congress found it necessary to reinstate the sovereign immunity of non-consenting tribes in transactions involving allotments. Nor does the ILCA statutory scheme reveal that Congress knew it had waived tribal sovereign immunity in the condemnation statute.

PNM cites *United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1*, No. CIV 80-116 RMB, 1995 WL 17198637, *6 (E.D. Wash. July 24, 1995). The controversy in that case stemmed from the construction of the Box Canyon dam built decades earlier on a location downstream from the Kalispel Indian Reservation. *Id.* The dam caused certain reservation lands and allotted lands to flood year around. *Id.* The United States, on behalf of the Kalispel Tribe and the individual allottees, sued the Utility for trespass. *Id.* At trial, the district court determined that the Utility had trespassed and awarded damages, but not injunctive relief against future flooding. *Id.* *2. The district court denied injunctive relief because it concluded the Tribe would be fully compensated in the condemnation proceeding filed by the Utility. *Id.*

The Ninth Circuit reversed the denial of injunctive relief finding that the Utility could not condemn land held in trust by the United States for the Tribe under § 357. *United States v. Pend Oreille Public Utility Dist. No. 1*, 28 F.3d 1544, 1551 (9th Cir. 1994) (citing *NPPD*). The Ninth Circuit further ruled that the Utility could not condemn the land under the Federal Power Act (FPA), but had to obtain a license, which required the Secretary to find "that the Utility's power project will not interfere with the purpose for which the Kalispel Reservation was created or acquired." *Id.* at 1548. However, the Ninth Circuit left to the district court the issue of whether the Utility could nevertheless condemn lands of individual Indian allottees under § 357. *Id.* at 1552.

On remand, the United States argued that § 357 was impliedly repealed by the FPA. 1995 WL 17198637, *5. The district court held that "the FPA and § 357 . . . are alternative methods for obtaining allotted Indian lands for a power project." *Id.* Citing an earlier Ninth Circuit decision, the district court stated, "Congress [in § 357] explicitly afforded no special protection to *allotted lands* beyond that which land owned in fee already received under the state laws of

eminent domain." *Id.* *6 (emphasis added) (citing *Southern California Edison Co. v. Rice*, 685 F.2d 354 (9th Cir. 1982)). The district court also noted that Congress did not amend § 357 after implementing its policy of allotting lands in severalty to Indians, and said this "establishes [Congress'] intent to allow condemnation actions to proceed against allotted lands." *Id.* (citing *Rice*, 685 F.2d at 356). However, the district court found that the Utility could not condemn the land under § 357 because condemnation under that section required the United States' consent, which the Utility had not obtained. *Id.*, *aff'd* 135 F.3d 602, 614 (9th Cir. 1998).

PNM asks the Court to extend the reasoning in *Pend Oreille* and hold that Congress, by not amending § 357 after allowing tribal acquisition of allotted lands in the ILCA, intended to allow condemnation of *allotted lands* even after those lands were acquired by tribes under the ILCA. However, PNM ignores the Ninth Circuit's holding in *Pend Oreille*, 28 F.3d at 1552, that condemnation under § 357 could be prosecuted only against individually allotted lands. In sum, although Congress has continuously allowed the condemnation of allotted lands after enacting the ILCA, this Court, along with other courts, cannot discern a Congressional intent to abrogate tribal sovereign immunity as to condemnation actions against allotted lands acquired by tribes. *See, e.g., NPPD*, 719 F.2d at 961 (distinguishing between allotted land, subject to § 357, and "tribal land," not subject to § 357).

### 3.    Special statute versus general statute

PNM argues that a well-recognized doctrine of statutory construction applies to allow this condemnation action against the Nation. PNM asserts that § 357 is a "special statute applying only to condemnation proceedings" and that "[w]here there are two statutes upon the same subject, the earlier being special and the later general, unless there is an express repeal or an absolute incompatibility, the presumption is that the special is intended to remain in force as an

exception to the general." *Town of Okemah*, 140 F.2d at 965. According to PNM, § 357's special authorization to condemn allotted lands in federal court remains in full force as an exception to any sovereign immunity claims that might arise when tribes acquired allotted lands under the general ILCA.

PNM asks the Court to apply the reasoning of the Tenth Circuit in *Town of Okemah*. In that case, the Tenth Circuit determined that § 357 required the joinder of the United States in a condemnation proceeding, which meant that the suit must be brought in federal court. Moreover, the court determined that § 357 was not repealed by the later general statute, the Act of April 12, 1926, 44 Stat. 239. The Act of April 12, 1926 permitted suits affecting title to lands owned by members of the Five Civilized Tribes in Oklahoma to be brought in state courts and made judgments binding on the United States if notice was served on the Superintendent of the Five Civilized Tribes. *Id.* The court upheld the dismissal of a state court condemnation proceeding against allotments owned by individual members of one of the Five Civilized Tribes because § 357 was in full force and effect despite the later statute allowing state court suits involving land of the Five Civilized Tribes. *Id.*

In order for PNM's argument to persuade, § 357 must be interpreted to allow condemnation of allotted lands owned by individual Indians and allotted lands acquired by tribes under the ILCA. By its express language, however, § 357 allows condemnation against lands allotted in severalty to Indians, not tribes. Moreover, § 357 allows condemnation of allotted lands, but the ILCA allows voluntary acquisition of allotted lands, and the ILCA regulates transactions involving those allotted lands, which include consensual, not condemned, rights of way. Unlike the statutes governing suits against allotted land in *Town of Okemah*, § 357 and the ILCA are not "statutes upon the same subject." *Id.* at 965. Hence, § 357, a specialized

condemnation statute, does not allow condemnation of previously allotted lands acquired by Indian tribes under the ILCA, a general Indian land consolidation statute.

However, even if the Court were to accept PNM's argument that §357 allows condemnation of allotted lands despite ownership by a tribe, which the Court does not, that conclusion alone would not expose the Nation to condemnation suits. Section 357 must not only authorize condemnation of allotted lands owned by tribes, it must also authorize condemnation suits against tribes. Congress can direct a statute to govern actions of Indian tribes, but Congress must also expressly abrogate an Indian tribe's sovereign immunity for enforcement suits. *Santa Clara Pueblo*, 436 U.S. at 59 (holding that even though federal statute (ICRA) provided, "[n]o Indian tribe in exercising powers of self-government shall . . . deny to any person within its jurisdiction the equal protection of its laws[,]" the statute did not expressly authorize civil actions against the tribe to enforce this provision in federal court). Consequently, although Congress has not amended the language of § 357 that allows condemnation of allotted lands, this Court declines to say that this means Congress intended to abrogate tribal sovereign immunity so as to allow condemnation of allotments acquired by tribes. *Cf. Kiowa Tribe of Okla.*, 523 U.S. at 755 (noting that "a State may have authority to tax or regulate tribal activities occurring within the State, . . . however, [that] is not to say that a tribe no longer enjoys immunity from suit.") (citing *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 510 (1991) (holding that power to tax does not mean state has power to enforce tax laws in state court)).

### 4. Application of *Oneida* case

Finally, PNM points to a case allowing condemnation against land owned by an Indian tribe located outside the boundaries of a reservation. *Oneida Tribe of Indians of Wisconsin v.*

*Village of Hobart, Wisconsin*, 542 F. Supp. 2d 908 (E.D. Wis. 2008) involved land that had originally been part of the Oneida reservation. One hundred years prior to the lawsuit, the United States transferred the land by fee patent to individual tribal members. *Id.* at 909. The tribal members then transferred fee title to non-Indians, and much later the tribe repurchased the land on the open market. *Id.* at 912. The tribe sought declaratory relief in federal court that it was immune from a condemnation suit pending in state court. *Id.* Noting that "[l]and is either exempt from state law, or it is not[,]" *id.* at 921, the district court held that the United States' transfer of the land by fee patents to the individual tribal members removed all federal protections for the land and the land was subject to condemnation under state law, despite its later acquisition by a tribe with sovereign immunity. *Id.* at 922–23. The tribe argued that when it acquired title to the land, the land became "tribal land" as defined in 25 C.F.R. § 169.1(d). The court rejected the argument because § 169.1(d) defines tribal land as "land or any interest therein, title to which is held by the United States in trust for a tribe, or title to which is held by any tribe subject to Federal restrictions against alienation or encumbrance. . . ." *Id.* at 922. The *Oneida* court reasoned that the land was not "tribal land" because fee patents had been issued, and "all restrictions as to the sale, taxation and alienation of the lands" had been removed. *Id.* Once federal protection was removed from these allotted lands, "a tribe may not unilaterally restore it by purchasing the land on the open market." *Id.* at 923.

PNM contends that under the *Oneida* court's reasoning, since the Two Allotments were subject to condemnation when owned by individual tribal members, the Nation's acquisition of fractional interests in the Two Allotments could not reinstate immunity protection over them, just as the Oneida tribe could not restore federal protection over the land purchased on the open market. *Id.* However, PNM fails to account for the elemental difference between the land

23

acquired by the Oneida tribe and the Two Allotments. The Oneida tribe acquired fee simple title

to the land from individual fee owners. The Nation does not have fee title to the Two Allotments.

The court in *Oneida* recognized this very important distinction when it rejected the

argument that the land had become "tribal land," as defined by 25 C.F.R. § 169.1(d):

> [T]itle to the land at issue in this case is not held by the United States in trust for
> the Tribe; nor is it held by the Tribe subject to federal restrictions against
> alienation or encumbrance. The Tribe holds it in fee simple. Having purchased the
> land on the open market, the Tribe is free, subject to the limitations of its own
> constitution and by-laws, to sell it to whomever it chooses.

*Id.* at 922 (citing *NPPD*). The *Oneida* court also rejected the tribe's attempt to equate its

ownership interest with that of the allotment owners in *NPPD*:

> Although the land in [*NPPD*] . . . had been allotted in severalty to individual
> Indians during the allotment era, the trust period for those allotments had never
> expired. . . . That is not the case here. Fee-patents issued for all of the land that the
> Village seeks to condemn nearly 100 years ago. . . .[U]pon issuance of fee-patents
> by the United States, all federal protection for the land in question, including
> exemption from state laws authorizing condemnation of land for public purposes,
> was removed.

*Id.* In this case, however, the Nation did not acquire fee title to the Two Allotments. It

was the acquisition of the fee title that removed the federal protection from the land in

*Oneida*. Here, federal protection was continuously available for all trust land beneficially

owned by the Nation, including all allotted land acquired from individual allottees.

The Nation's sovereign immunity must be unequivocally abrogated by Congress, and

Congress' allowance of transfer of allotted lands to tribes in the ILCA is not an unequivocal

abrogation. Nor can the Nation be held to have waived its immunity merely by acquiring a

fractional interest in the Two Allotments. As the Nation asserts in its Reply, it is up to Congress

to solve the issues related to tribal immunity from § 357 condemnation actions involving allotted

land that would otherwise be subject to condemnation if owned by individual tribal members. If

Congress deems it appropriate to abrogate tribal immunity in order to facilitate condemnation of rights of way through tribal trust lands, Congress must unequivocally do so. *Cf. Kiowa Tribe of Okla.*, 523 U.S. at 758 (declining to limit sovereign immunity to reservation activities or to non-commercial activities, "we defer to the role Congress may wish to exercise in this important judgment.").

### C.   DISMISSAL OF THE TWO ALLOTMENTS

The Nation argues that as an owner of a fractional interest in the Two Allotments, the Nation must be a party in this condemnation action. However, as a sovereign, the Nation is immune from suit. Hence, the Nation asks the Court to dismiss it as a defendant. In addition, the Nation asks the Court to dismiss the Two Allotments because the Nation is a required party that cannot be joined. PNM asserts that the Nation is not a required party under Rule 19(a), but if it is, the Court need not dismiss under Rule 19(b) because the Court can accord complete relief among the existing parties while protecting the Nation's interests.

In relying on Rule 19, both PNM and the Nation ignore the basic premise that PNM lacks the authority to condemn the Two Allotments because the portion of the Two Allotments owned by the Nation are now considered "tribal land," as opposed to allotted land. Hence, the Two Allotments cannot be condemned under § 357. *NPPD*, 719 F.2d at 961. As the court in *NPPD* recognized, when a tribe acquires an interest in allotted land, the land is no longer land "allotted in severalty to Indians," and § 357 authorizes a condemnation authority to condemn only individually allotted land. *See NPPD*, 719 F.2d at 962.

However, the Court will address the Rule 19 arguments. The Court must first determine whether as a fractional interest owner in the Two Allotments, the Nation is a required party under Rule 19(a). If a required party cannot be joined, under Rule 19(b), the Court next considers

whether the case should be dismissed if "in equity and good conscience" the action cannot

proceed in that party's absence. The four factors to consider under Rule 19(b) are

> first, to what extent a judgment rendered in the person's absence might be
> prejudicial to [the person] or to those already parties; second, the extent to which,
> by protective provisions in the judgment, by the shaping of relief, or other
> measures, the prejudice can be lessened or avoided; third, whether a judgment
> rendered in the person's absence will be adequate; fourth, whether the plaintiff
> will have an adequate remedy if the action is dismissed for nonjoinder.

*Enterprise Management Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th

Cir. 1989).

> 1.      Under Rule 19(a), the Nation is a required party.

The Nation argues that *Northern Arapaho Tribe v. Harnsberger*, 697 F.3d 1272 (10th

Cir. 2012) is instructive. The Northern Arapaho Tribe (NAT) sought to enjoin state and county

officials from imposing vehicle excise taxes on Indians living on the Wind River Indian

Reservation (the Reservation) because, as inhabitants of "Indian Country," they were exempt

from taxes. The NAT argued that the Reservation's status as Indian Country was not altered by a

1905 Agreement under which some of the Reservation land was ceded to the United States. *Id.* at

1276. The NAT and the Eastern Shoshone Tribe each owned an undivided one-half interest in

the Reservation lands.

The defendants moved to dismiss under Rule 12(b)(7) for failure to join the Eastern

Shoshone Tribe and the United States as defendants. The district court denied the motion to

dismiss but ordered the Eastern Shoshone Tribe and the United States joined as third party

defendants. The Eastern Shoshone Tribe and the United States then moved to dismiss under Rule

12(b)(1) on the grounds of sovereign immunity. In response, the defendants renewed their

contention under Rule 19 that the Eastern Shoshone Tribe and the United States were

indispensable parties and the case "in equity and good conscience" should be dismissed. The district court agreed and dismissed the case.

The Tenth Circuit affirmed and concluded that the Eastern Shoshone Tribe was an indispensable party because it had an "interest relating to the subject of the action," namely the "Indian Country" status of the land, and a determination of that status in its absence would impair its ability to protect its one-half interest in the land. *Id.* at 1279. Also, the disposition of the case in the absence of the Eastern Shoshone Tribe "may . . . leave an existing party—namely the State of Wyoming—subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations." *Id.* (citing Rule 19(a)(1)(B)(ii)).

The Nation argues that, like the Eastern Shoshone Tribe, it is a required party under Rule 19(a)(1)(B)(i) because it owns a fractional interest in the Two Allotments and its governance of the Two Allotments will be affected by the perpetual easement PNM seeks. PNM contends that the Nation is not a required party because complete relief can be accorded to the fractional interest owners of the Two Allotments even in the Nation's absence. According to PNM, the award of just compensation for the easement in this proceeding will be distributed among the allotment owners, including the Nation, according to their percentage ownership.

PNM also recognizes that a condemnation proceeding has two stages. During the first stage, the Court determines whether PNM has the authority to condemn the easements under § 357. If the answer is yes, then the Court determines the amount of just compensation. In its argument, however, PNM skips the first half of the analysis and focuses on the allocation of the condemnation proceeds. PNM fails to address its authority to bring this action, which derives from § 357, and the Court has just concluded that PNM has no authority to condemn the Nation's interest in the Two Allotments under § 357.

PNM illustrates its point regarding fair distribution of the condemnation award by comparing this action to a consensual easement. If PNM had obtained a consensual easement from the Secretary under 25 U.S.C. § 2213, without the Nation's consent, then PNM would pay the Secretary for that easement, and the Nation would be entitled to a portion of that payment. PNM maintains that if this condemnation case went forward as to the Two Allotments, the Nation would likewise be entitled to its portion of the just compensation award. PNM fails to acknowledge that under the consensual easement provisions, if the Nation did not consent but the Secretary approved the easement, the Nation would not be considered a party to the easement agreement, and its sovereignty would not be affected. 25 U.S.C. § 2213(c)(2). Moreover, PNM equates the Nation's lack of consent to an easement under this section, with the Nation's absence from a lawsuit under which the Two Allotments would be involuntarily taken and the Court would determine an amount of just compensation. *See* Fed. R. Civ. P. 71.1(h) (involving trial of the issues).

The Nation counters that it is a required party under Rule 19(a) because if this action continues without the Nation, its interest in not having its property involuntarily taken by eminent domain would certainly be "impaired or impeded." Fed. R. Civ. P. 19(a)(1)(b)(ii). The Court agrees. As a sovereign, the Nation has an independent interest to be free from involuntary condemnation of the Two Allotments. The Nation's interest in being immune from condemnation actions and even its interest in adequate compensation cannot be adequately protected. This conclusion is supported by Rule 71.1(c)(3) that the plaintiff "must add as defendants all those persons who have or claim an interest" in the property. This requirement is tied to the due process rights of property owners in condemnation actions. *See Leyba v. Armijo,*

28

11 N.M. 437, 68 P. 939, 940–41 (1902) (noting that property may not be condemned without due process which means adherence to statutory requirements and notice to the owner of property).

PNM asserts that the Nation's interest will not be impaired or impeded because the United States, as trustee with a fiduciary duty to protect the Nation, will sufficiently safeguard the interests of the Nation. As recognized by the court in *Pend Oreille*, "the interest of the United States continues throughout the condemnation proceedings and extends to what shall be done with the proceeds." 1995 WL 17198637, *6. However, the United States cannot protect the Nation's primary interest in maintaining its immunity from suit. Finally, Rule 71.1 requires joinder of both the holders of beneficial title and the holders of legal title to property. As a fractional interest owner of the Two Allotments, the Nation is a required party to this condemnation action.

2.     Under Rule 19(b), the Two Allotments must be dismissed.

The Court considers four factors in this analysis: (1) whether existing and absent parties will be prejudiced; (2) whether that prejudice can be lessened or avoided; (3) whether the judgment would be adequate in the party's absence; and (4) whether the plaintiff would have an adequate remedy if the case is dismissed.

(a) whether the judgment, in the party's absence, will be prejudicial to the party or to existing parties

The Nation argues that its vital sovereignty interests would be prejudiced if condemnation of the Two Allotments is allowed in its absence. PNM argues that the Nation's interests in the Two Allotments will not be prejudiced. PNM again points to the statutory scheme in the ILCA that allows the Secretary to enter into transactions affecting the Two Allotments— and to compensate the Nation in proportion to its fractional interest—even if the Nation does not consent to the transaction. 25 U.S.C. § 2213. In addition, PNM contends that the condemnation

of an easement will not affect the Nation's title to its undivided fractional interests in the Two

Allotments. However, the Nation is asserting prejudice as to its sovereignty, and not to its

pocketbook or ownership interest. PNM dismisses the fundamental difference between the

consensual grants of rights of way and condemnation actions. The former is an administrative

process under which the Secretary determines whether a transaction is in the best interests of

allotment owners. The latter is an involuntary taking of property in an adversarial proceeding, an

assault on the Nation's sovereignty. This factor weighs in favor of dismissing the Two

Allotments.

(b) <u>whether the prejudice can be lessened or avoided by protective<br>provisions in the judgment or by the shaping of relief</u>

PNM asserts that the Nation's interests could be protected if the Court provided for

proportionate distribution of the award to the Nation in the condemnation judgment. However,

this assumes the only interest negatively affected is the Nation's right of compensation. The

involuntary imposition of a right of way on the Two Allotments prejudices the Nation's

sovereignty interests. The finding of just compensation cannot be tailored to lessen that effect.

(c) <u>whether a judgment rendered in the party's absence will be adequate</u>

The Tenth Circuit explained that "[t]he concern underlying this factor is not the

plaintiff's interest 'but that of the courts and the public in complete, consistent, and efficient

settlement of controversies,' that is, 'the public stake in settling disputes by wholes, whenever

possible.'" *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1291–92 (10th Cir. 2003)

(quoting, *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1967)).

PNM contends that permitting this litigation to proceed to judgment would wholly settle the

matter involving PNM's easement on the Two Allotments; thus, this factor weighs against

dismissal.

The Nation states it is unclear what effect a condemnation, without the Nation's presence, would have on PNM's right of way to maintain its electrical transmission line. A condemnation must bind all owners of property, and an incomplete condemnation judgment may be unenforceable. *Martin v. Wilkes*, 490 U.S. 755, 761–62 (1989) (stating as a general matter, judgments do not bind non-parties); *see also Jachetta*, 653 F.3d at 907 ("If the United States is not a party to the action, any judicial decision condemning the land 'has no binding effect,' so "the United States may sue to cancel the judgment and set aside the conveyance made pursuant thereto."). This factor does not weigh in PNM's favor.

(d) <u>whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder</u>

PNM contends that dismissal of this action as to the Two Allotments would leave PNM without a way to exercise its right of eminent domain. PNM asserts that because the United States Supreme Court has held in *State of Minnesota* that the United States is an indispensable party to all actions brought under § 357, all condemnation actions must be brought in federal court. Hence, PNM must bring this action in federal court where the Nation cannot be sued. And, PNM has no other forum in which to condemn its easement on the Two Allotments. In other words, PNM contends that without the authority to condemn the Two Allotments under § 357, it has no means by which it can acquire its easement. The Nation admits this, but argues that sovereign immunity necessarily results in a lack of remedy against a sovereign and that its sovereignty interests outweigh PNM's eminent domain rights.

The Court finds that PNM is not completely without a remedy. PNM can acquire a voluntary easement under 25 U.S.C. §§ 323–328. As stated *supra*, this statutory scheme and administrative procedure is an alternative to § 357's condemnation of allotted land in federal court. *See generally* Miller, 26 Am. Indian L. Rev. at 121–25 (recognizing that the only way to

31

obtain easements over tribal lands is by the procedures set out in §§ 323–328 and detailed in the regulations, which requires approval from the Secretary of Interior and written consent from the appropriate tribal officials).

The Court concludes that under Rule 19(a) the Nation is a required party that cannot be joined and that under Rule 19(b) the Court cannot "in equity and good conscience" proceed with this condemnation action against the Two Allotments.

IT IS ORDERED that the MOTION TO DISMISS THE NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 (Doc. No. 32) is granted and the claims against the Nation and the Two Allotments will be dismissed without prejudice for lack of subject matter jurisdiction.

_____
SENIOR UNITED STATES DISTRICT JUDGE