## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**PUBLIC SERVICE COMPANY**
**OF NEW MEXICO,**
          **Plaintiff,**

**vs.**                                                      **No. 15 CV 501 JAP/CG**

**APPROXIMATELY 15.49 ACRES OF LAND**
**IN MCKINLEY COUNTY, NEW MEXICO;**
**NAVAJO NATION;**
**NAVAJO TRIBAL UTILITY AUTHORITY;**
**CONTINENTAL DIVIDE ELECTRIC COOPERATIVE, INC.;**
**TRANSWESTERN PIPELINE COMPANY, LLC;**
**CITICORP NORTH AMERICA, INC.;**
**CHEVRON USA INC., as successor in interest to Gulf Oil Corp.;**
**HARRY HOUSE, Deceased;**
**LORRAINE BARBOAN, also known as, LARENE H. BARBOAN;**
**PAULINE H. BROOKS;**
**BENJAMIN HOUSE, also known as, BENNIE HOUSE;**
**ANNIE H. SORRELL, also known as, ANNA H. SORRELL;**
**MARY ROSE HOUSE, also known as, MARY R. HOUSE;**
**DOROTHY HOUSE, also known as, DOROTHY W. HOUSE;**
**LAURA H. LAWRENCE, also known as, LAURA H. CHACO;**
**LEO HOUSE, JR.; JONES DEHIYA; NANCY DEHEVA ESKEETS;**
**JIMMY A. CHARLEY, also known as, JIM A. CHARLEY;**
**MARY GRAY CHARLEY, also known as, MARY B. CHARLEY;**
**BOB GRAY, Deceased, also known as, BOB GREY;**
**CHRISTINE GRAY BEGAY, also known as, CHRISTINE G. BEGAY;**
**THOMAS THOMPSON GRAY, also known as, THOMAS GREY;**
**JIMMIE GREY, also known as, JIMMIE GRAY;**
**LORRAINE SPENCER;**
**MELVIN L. CHARLES, also known as, MELVIN L. CHARLEY;**
**MARLA L. CHARLEY, also known as, MARLA CHARLEY;**
**KALVIN A. CHARLEY; LAURA A. CHARLEY;**
**MARILYN RAMONE; WYNEMA GIBERSON;**
**IRENE WILLIE, also known as, IRENE JAMES WILLIE;**
**EDDIE MCCRAY, also known as, EDDIE R. MCCRAE;**
**ETHEL DAVIS, also known as, ETHEL B. DAVIS;**
**CHARLEY JOE JOHNSON, also known as, CHARLEY J. JOHNSON;**
**WESLEY E. CRAIG; HYSON CRAIG; NOREEN A. KELLY;**
**ELOUISE J. SMITH;**
**ELOUISE ANN JAMES, also known as, ELOUISE JAMES WOOD, also known as,**
**ELOISE ANN JAMES, also known as, ELOUISE WOODS;**

LEONARD WILLIE;
ALTA JAMES DAVIS, also known as, ALTA JAMES;
ALICE DAVIS, also known as, ALICE D. CHUYATE;
PHOEBE CRAIG, also known as, PHOEBE C. COWBOY;
NANCY JAMES, also known as, NANCY JOHNSON;
BETTY JAMES, Deceased;
LINDA C. WILLIAMS, also known as, LINDA CRAIG-WILLIAMS;
GENEVIEVE V. KING; LESTER CRAIG; SHAWN STEVENS;
FABIAN JAMES;
DAISY YAZZIE CHARLES, also known as,
DAISY YAZZIE, also known as, DAISY J. CHARLES;
ROSIE YAZZIE, Deceased;
KATHLEEN YAZZIE JAMES, also known as, CATHERINE R. JAMES;
VERNA M. CRAIG;
JUANITA SMITH, also known as, JUANITA R. ELOTE;
ALETHEA CRAIG, SARAH NELSON, LARRY DAVIS, JR.;
BERDINA DAVIS; MICHELLE DAVIS; STEVEN MCCRAY;
VELMA YAZZIE; GERALDINE DAVIS;
LARRISON DAVIS, also known as, LARRISON P. DAVIS;
ADAM MCCRAY; MICHELLE MCCRAY;
EUGENIO TY JAMES; LARSON DAVIS; CORNELIA A. DAVIS;
CELENA DAVIS, also known as, CELENA BRATCHER;
FRANKIE DAVIS;
GLEN CHARLES CHARLESTON, also known as, GLEN C. CHARLESTON;
VERNA LEE BERGEN CHARLESTON, also known as, VERNA L. CHARLESTON;
VERN CHARLESTON;
GLENDA BENALLY, also known as, GLENDA G. CHARLESTON;
KELLY ANN CHARLESTON, also known as, KELLY A. CHARLESTON;
SHERYL LYNN CHARLESTON, also known as, SHERYL L. CHARLESTON;
SPENCER KIMBALL CHARLESTON, JR., Deceased;
EDWIN ALLEN CHARLESTON, also known as, EDWIN A. CHARLESTON;
CHARLES BAKER CHARLESTON, also known as, CHARLES B. CHARLESTON;
SAM MARIANO; HARRY HOUSE, JR.; MATILDA JAMES; DARLENE YAZZIE;
Unknown owners, Claimants and Heirs of the Property Involved,
Unknown Heirs of Harry House, Deceased;
Unknown Heirs of Bob Gray (Bob Grey), Deceased;
Unknown Heirs of Betty James, Deceased;
Unknown Heirs of Rosie C. Yazzie, Deceased;
Unknown Heirs of Spencer Kimball Charleston, Jr. (Spencer K. Charleston), Deceased;
Unknown Heirs of Helen M. Charley, Deceased;
ESTATE OF ROSIE C. YAZZIE, Deceased;
ESTATE OF SPENCER K. CHARLESTON, Deceased;
UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and
UNITED STATES DEPARTMENT OF THE INTERIOR;
        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## MOTION TO ALTER OR AMEND ORDER DISMISSING NAVAJO NATION
## AND ALLOTMENT NUMBERS 1160 AND 1392

Plaintiff Public Service Company of New Mexico (PNM) asks the Court to alter or amend its MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS THE NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 (Doc. No. 101) (Memorandum Opinion) and set aside its ORDER OF DISMISSAL WITHOUT PREJUDICE (Doc. No. 102) (Order of Dismissal). *See* PLAINTIFF PUBLIC SERVICE COMPANY OF NEW MEXICO'S MOTION TO ALTER OR AMEND ORDER DISMISSING THE NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 OR IN THE ALTERNATIVE MOTION FOR INTERLOCUTORY CERTIFICATION OR SEVERANCE OF CASE (Doc. No. 107) (Motion).[1] Because PNM has failed to meet the requirements for granting motions to reconsider, the Court will deny the Motion in part. However, the Court will grant the Motion in part and certify for interlocutory appeal the controlling questions of law presented in this case.

---

[1] On January 12, 2016, the Navajo Nation (Nation) filed its RESPONSE IN OPPOSITION TO MOTION TO ALTER OR AMEND ORDER OR IN THE ALTERNATIVE MOTION FOR INTERLOCUTORY CERTIFICATION OR SEVERANCE OF CASE (Doc. No. 110) (Nation's Response). On January 12, 2016, the United States filed UNITED STATES' RESPONSE IN OPPOSITION TO PLAINTIFF'S DECEMBER 29, 2015 MOTION TO ALTER OR AMEND ORDER OF DECEMBER 1, 2015 (Doc. No. 114) (the United States' Response). On January 25, 2016, 22 of the individual allotment owner defendants filed INDIVIDUAL DEFENDANTS' RESPONSE TO PNM'S MOTION TO ALTER OR AMEND (Doc. No. 116) (22 Defendants' Response) adopting the arguments in the Nation's Response and the United States' Response. On January 26, 2016, PNM filed PLAINTIFF PUBLIC SERVICE COMPANY OF NEW MEXICO'S REPLY TO THE NAVAJO NATION'S RESPONSE IN OPPOSITION TO MOTION TO ALTER OR AMEND ORDER DISMISSING THE NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 OR IN THE ALTERNATIVE MOTION FOR INTERLOCUTORY CERTIFICATION OR SEVERANCE OF CASE (Doc. No. 117) (Reply to Nation's Response). On February 5, 2016, PNM filed PLAINTIFF PUBLIC SERVICE COMPANY OF NEW MEXICO'S REPLY TO THE UNITED STATES' RESPONSE IN OPPOSITION TO MOTION TO ALTER OR AMEND ORDER DISMISSING THE NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 OR IN THE ALTERNATIVE MOTION FOR INTERLOCUTORY CERTIFICATION OR SEVERANCE OF CASE (Reply to United States' Response). And on February 8, 2016, PNM filed PNM filed PLAINTIFF PUBLIC SERVICE COMPANY OF NEW MEXICO'S REPLY TO 22 DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION TO ALTER OR AMEND ORDER DISMISSING THE NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 OR IN THE ALTERNATIVE MOTION FOR INTERLOCUTORY CERTIFICATION OR SEVERANCE OF CASE (Reply to 22 Defendants' Response) . The Court has carefully considered all arguments presented in these briefs.

I.      BACKGROUND

This case involves a utility easement granted to PNM in the 1960s for a fifty-year term (the Original Easement). On the easement PNM constructed and maintains a 115-Kilovolt electric transmission line, known as the "AY Line." The AY Line is a crucial component of PNM's electricity transmission system in northwestern New Mexico and crosses five allotments owned by members of the Navajo Nation (Nation). The allotments, located in McKinley County, New Mexico, will be referred to as (1) Allotment 1160, (2) Allotment 1204, (3) Allotment 1340, (4) Allotment 1392, and (5) Allotment 1877 (together, the Five Allotments). The United States owns fee title to the Five Allotments in trust for the beneficial interest owners. The Nation owns an undivided 13.6 % beneficial interest in Allotment 1160 and an undivided .14 % beneficial interest in Allotment 1392 (together, the Two Allotments).

In April 2009, prior to the expiration of the Original Easement, PNM acquired written consent from a sufficient number of the individual owners of beneficial interests and submitted a renewal application to the Department of the Interior's Bureau of Indian Affairs (BIA). In June 2014, counsel for the 22 Defendants, who own a majority of the beneficial interests in the Five Allotments, notified the BIA and PNM that they had revoked their consent. In the ensuing months, PNM attempted in good faith, though unsuccessfully, to obtain the necessary consents to renew the Original Easement.[2] In January 2015, the BIA notified PNM that the revocations precluded the BIA from approving PNM's renewal application.

On June 13, 2015, PNM initiated this action under 25 U.S.C. § 357 to condemn a perpetual easement on the Five Allotments. Asserting sovereign immunity, the Nation moved to dismiss the condemnation claims against it and against the Two Allotments arguing that the Nation is an indispensable party. The Court granted the Nation's MOTION TO DISMISS THE

---

[2] The FAC does not allege whether PNM sought the Nation's consent to renew the Original Easement.

4

NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 (Motion to Dismiss) and dismissed the condemnation claims against the Nation without prejudice.

In the Motion, PNM asks the Court to set aside the Memorandum Opinion and the Order of Dismissal. In the alternative, PNM asks the Court to apply its ruling prospectively and allow PNM to condemn easements required for PNM's existing infrastructure. If the Court denies both of these requests, PNM asks the Court to (1) certify for interlocutory appeal the controlling questions of law presented in this case or (2) sever PNM's claims against the Two Allotments from this case and enter a final appealable judgment. Because an interlocutory appeal will promote judicial economy and will help determine questions of law vital to PNM's authority to condemn property in Indian Country, the Court will grant PNM's request to certify issues for interlocutory appeal.

II.     STANDARD OF REVIEW

PNM's Motion asks the Court to alter or amend the Memorandum Opinion under Rule 59(e). Technically, Rule 59(e) does not apply here because the Memorandum Opinion is not a final order or judgment. *Guttman v. New Mexico*, 325 F. App'x 687, 690 (10th Cir. 2009) ("Rule 59(e) does not apply because the court's order was not a final judgment . . ."). Properly speaking, PNM's Motion is a motion to revise an interim order under Fed. R. Civ. P. 54(b), which provides, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." However, the standard for reviewing a Rule 54(b) motion for reconsideration is the same as the standard for reviewing a Rule 59(e) motion to alter or amend a judgment. *Ankeney v. Zavaras*, 524 F. App'x 454, 458 (10th Cir. 2013) (unpublished); *see also Pia v. Supernova*

*Media, Inc.*, No 2:09-cv-00840, 2014 WL 7261014, *1–2 (D. Utah Dec. 18, 2014) (unpublished).

Hence, the Court can grant the Motion if PNM shows: (1) there has been an intervening change

in the controlling law; (2) there is new evidence previously unavailable; or (3) the Court needs to

correct clear error or prevent manifest injustice. *Servants of Paraclete v. Does*, 204 F.3d 1005,

1012 (10th Cir. 2000). In other words, the Court may grant the Motion if it has "misapprehended

the facts, a party's position, or the controlling law." *Id.* As with a Rule 59(e) motion, PNM may

not ask the court to revisit issues already considered. *Id.* And PNM may not "rehash previously

rejected arguments." *Achey v. Linn County Bank*, 174 F.R.D. 489, 490 (D. Kan. 1997). In

addition, PNM may not present arguments that it could have raised in the initial briefing. *Van

Skiver v. United States*, 953 F.2d 1241, 1243 (10th Cir. 1991).

    III.    ANALYSIS

        A.    DISMISSAL WAS NOT *SUA SPONTE*

Section 3 of the Act of March 3, 1901 provides: "Lands allotted in severalty to Indians

may be condemned for any public purpose under the laws of the State or Territory where located

in the same manner as land owned in fee may be condemned, and the money awarded as

damages shall be paid to the allottee." 25 U.S.C. § 357. The Court concluded PNM could not

condemn the Two Allotments under § 357 because the Nation owns a fractional interest in the

Two Allotments. Thus, the Court determined that the Two Allotments are no longer "lands

allotted in severalty to Indians" as provided in § 357. Alternatively, the Court held that as a

partial owner of the Two Allotments, the Nation is an indispensable party that cannot be joined

due to sovereign immunity. Therefore, the Court determined that, under Rule 19(b), "in equity

and good conscience," the claims against the Two Allotments should be dismissed.

PNM contends that since the Nation only argued for dismissal under Rule 19 and did not argue that PNM lacked authority to condemn the Two Allotments under § 357, "PNM had no reason to address any argument that the Two Allotments are 'tribal lands,' are no longer 'lands allotted in severalty to Indians,' or are in any way exempt from the scope of Section 357." (Mot. at 5.) According to PNM, the Court reached its key holding *sua sponte* in the absence of any party advocating for such holding. (*Id.*) In response, the Nation contends that the Court's ruling on this issue was not essential to the decision because the alternative reason for dismissal of the Nation as an indispensable party with sovereign immunity is sufficient to uphold the decision to dismiss the Two Allotments.

In the first part of its Memorandum Opinion, the Court concluded that under the plain language of § 357 and under the scant case law interpreting § 357 in this context, PNM could not condemn the Two Allotments. In addition to considering the language of § 357 and the statutory history of Indian land allotment, the Court followed the holding in in *Nebraska Pub. Power Dist. v. 100.95 Acres of Land in Thurston Cnty., Hiram Grant*, 719 F.2d 956, 961 (8th Cir. 1983) (*NPPD*).

*NPPD* was a § 357 condemnation action brought against several tracts of land within the Winnebago Reservation. *Id.* at 957. The tracts had been allotted to individual tribal members under the General Allotment Act, 25 U.S.C. § 331 *et seq.*, or under a treaty between the tribe and the United States. *Id.* at 958. Shortly before the condemnation action was filed, several individual allotment owners transferred undivided future interests in their tracts to the United States in trust for the tribe, and the owners retained life estates. *Id.* In Part I of its opinion, the Eighth Circuit Court of Appeals reversed the district court's holding that none of the tracts could be condemned because § 357 had been impliedly repealed by the 1948 Act (25 U.S.C. §§ 323–328) authorizing

the Interior Secretary to grant rights of way across Indian lands. *Id.* at 958. The Eighth Circuit concluded that both statutes were enforceable. *Id.* at 961.

In Part II of its opinion, the Eighth Circuit used the definition of tribal lands in 25 C.F.R. § 169.1(d), a regulation governing consensual grants of rights of way on Indian lands. Section 169.1(d) defines tribal land as "land or *any interest therein*, title to which is held by the United States in trust for a tribe." *Id.* (emphasis added). The Eighth Circuit concluded that under this definition, tracts partially owned by the tribe had become "tribal land" that could not be condemned under § 357. *Id.* at 962.

PNM correctly asserts that in the Nation's Motion to Dismiss, the Nation did not argue that the Two Allotments were "tribal land." However, in its Response to the Motion to Dismiss (Doc. No. 39), PNM asserted that the Indian Land Consolidation Act (ILCA), the statute under which many tribes acquired title to previously allotted lands, did not "change the legal character of any parcel from allotted land to any other type of land (such as tribal trust land) as a result of an Indian tribe's acquisition of a fractional interest." (Resp. (Doc. No. 39) at 6.) PNM also asserted an "Indian tribe that acquires a fractional interest is, in substance, only stepping into the shoes of an allottee." (*Id.*)[3] Although these contentions were in the background section of PNM's Response to the Motion to Dismiss, PNM clearly presented its belief that the statutes, particularly the ILCA, which were intended to reverse the disastrous allotment policy, had no effect on § 357's general applicability to allotted lands. And, in its argument section, PNM asserted that in § 357, Congress specifically allowed condemnation of allotted land without regard to "which persons or entities own fractional interests in such parcel." (*Id.* at 7.) PNM further argued that Congress enacted and amended the ILCA without modifying § 357, thereby

---

[3] This argument was rejected by the *NPPD* court: "[i]t is the fact of tribal ownership which establishes the existence of tribal land, not the identity of the grantor." *NPPD*, 719 F.2d at 962.

demonstrating a congressional intent to abrogate tribal sovereign immunity against condemnation actions involving allotted lands. (*Id.*)

In its Response to the Motion to Dismiss, PNM asked the Court to focus on Part I of the *NPPD* opinion in which the Eighth Circuit found that the location of allotted lands, on or off of a reservation, did not alter their status as condemnable allotted lands:

> The appellees urge that we distinguish the previous courts of appeals decisions because they involved allotted land outside an Indian reservation. In contrast, the allotted land in this case is located within an Indian reservation. It may well be good policy to treat allotted land within a reservation, in which a tribe has a greater interest, differently from allotted land outside the reservation. Congress, however, has drawn no such distinction in the statute. We cannot ignore the plain meaning of the statute, which provides simply for condemnation of "allotted land" without regard to its location.

*Id.* at 961. PNM contended that if location did not alter the lands' status, neither should tribal ownership of the Two Allotments. PNM stressed that it was relying only on Part I of *NPPD*, that it expressly disagreed with the conclusion in Part II of *NPPD*, and that it would request to file a surreply brief if the Nation presented the *NPPD* Part I argument in its Reply brief. However, no surreply was necessary because the Nation, in both its Motion to Dismiss and in the Reply, only argued that the Nation should be dismissed because it had sovereign immunity, that it had not waived its immunity, and that its immunity had not been abrogated by Congress.[4]

In sum, the Court declined to follow PNM's argument that in § 357 Congress intended to abrogate tribal immunity by allowing the condemnation of allotted lands even if partially owned by tribes. The Court ruled that tribal ownership of the Two Allotments removed them from the reach of § 357 and that despite Congress's implied abrogation of the United States' sovereign immunity, the implied abrogation did not extend to the Nation. In its Memorandum Opinion, the

---

[4] However, PNM recognized that the Nation and the United States had already cited and quoted Part II of the *NPPD* opinion in their answers and argued that the Two Allotments were "tribal lands" as defined in the Part 169 regulations. *See* ANSWER TO CONDEMNATION COMPLAINT (Doc. No. 23) at 2; ANSWER OF THE UNITED STATES (Doc. No. 25) at 6.

Court agreed, "with the reasoning in *NPPD* that § 357 does not allow condemnation of lands owned by tribes[.]" However, the Court primarily relied "on the plain language of § 357 and its distinct application to lands 'allotted in severalty to Indians[,]'" which illustrated "a singular Congressional focus on allotted land owned by individual tribal members." (Mem Op. at 14 and note 16.) Therefore, the Court did not rule *sua sponte* that the Two Allotments were "tribal lands" as defined in the regulations related to consensual easements. Nevertheless, in the interest of clarity and completeness, the Court will address all of the contentions in the Motion, including the arguments related to *NPPD* Part II and the definition of "tribal land" found in the Part 169 regulations. More importantly, as the Nation contends, the Court's conclusion that PNM lacked statutory authority to condemn the Two Allotments, if erroneous, does not mean that the decision to dismiss the Nation and the Two Allotments must be set aside. The Court correctly determined that under Rule 19, the Nation was an indispensable party to this condemnation action that could not be feasibly joined due to sovereign immunity. Therefore, the case had to be dismissed because "in equity and good conscience," the action could not proceed against the Two Allotments in the Nation's absence.

B.    ONCE AN ALLOTMENT NOT ALWAYS AN ALLOTMENT

PNM maintains that for 130 years land "allotted in severalty to Indians" has been synonymous with the term "allotment." According to PNM, the allotment of land was a one-time historical event that permanently changed reservation lands into allotments subject to condemnation under § 357. However, Congress's changing policy toward Indian land and its abandonment of the allotment policy proves otherwise. As described in *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*,

> In the late 19th century, the prevailing national policy of segregating lands for the exclusive use and control of the Indian tribes gave way to a policy of allotting those lands to tribe members individually. The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large.

502 U.S. 251, 254 (1991). In the Indian General Allotment Act of 1887, also known as the Dawes Act,[5] Congress

> empowered the President to allot most tribal lands nationwide without the consent of the Indian nations involved. The Dawes Act restricted immediate alienation or encumbrance by providing that each allotted parcel would be held by the United States in trust for a period of 25 years or longer; only then would a fee patent issue to the Indian.

*Id.* As described in the Memorandum Opinion, Congress's allotment policy changed within a few decades because allotment proved disastrous for the Indians. *Hodel*, 481 U.S. 704, 706–07 (1987).[6]

PNM persuasively asserts that when the General Allotment Act was enacted, Congress did not contemplate, or have reason to contemplate, that allotted lands or fractional interests in allotted lands, would ever be transferred back to the tribe. In fact, Congress intended that allotted lands would eventually be freed from the trust and patented in fee to the owners. *See* 25 U.S.C. §349 (enacted in 1887, amended in 1906) (providing that state and territory laws applied to lands "[a]t the end of the trust period and when the lands have been conveyed to the Indians by patent in fee[.]").

---

[5] PNM attached to its Motion a copy of the Dawes Act, which was titled "An act to provide for the allotment of lands in severalty to Indians . . ." (Mot. Ex. 1.) PNM also attached a 1910 statute on descent and distribution of allotments, which referenced the Dawes Act and the lands as "allotments." (Mot. Ex. 2.)

[6] The Supreme Court in *Hodel* outlined the unintended consequences of the General Allotment Act:

> Cash generated by land sales to whites was quickly dissipated, and the Indians, rather than farming the land themselves, evolved into petty landlords, leasing their allotted lands to white ranchers and farmers and living off the meager rentals. . . . The failure of the allotment program became even clearer as successive generations came to hold the allotted lands. Thus 40–, 80–, and 160–acre parcels became splintered into multiple undivided interests in land, with some parcels having hundreds, and many parcels having dozens, of owners. Because the land was held in trust and often could not be alienated or partitioned, the fractionation problem grew and grew over time.

*Id.* at 707 (citations omitted).

As noted by the Supreme Court in *Babbitt v. Youpee*, Congress ended further allotment in the 1934 Indian Reorganization Act (IRA), 25 U.S.C. § 461 *et seq.* and allowed the Secretary of the Interior to acquire "any interest in lands . . . within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians." 519 U.S. 234, 237 (1997) (quoting 25 U.S.C. § 465). In repudiation of federal allotment policies, the IRA ended allotment and made possible the organization of tribal governments and tribal corporations. The passage of the IRA ended "the erosion of Indian land and resources and reaffirmed the inherent powers of tribal governments." AMENDING THE ACT OF JUNE 18, 1934, TO REAFFIRM THE AUTHORITY OF THE SECRETARY OF THE INTERIOR TO TAKE LAND INTO TRUST FOR INDIAN TRIBES, S. Rep. No. 112–166 (2012).

In 1983, Congress enacted the Indian Land Consolidation Act (ILCA), 25 U.S.C. §§ 2201–2221, which "contains a handful of provisions designed to ameliorate, over time, fractionated ownership." American Indian Law Deskbook, § 3.15 (4th ed. 2008). Under the ILCA, a tribe may purchase, at fair market value, all the interests in a tract so long as the owners of over fifty per cent of the undivided interests consent. The 2000 amendments to ILCA allowed the Secretary of the Interior to acquire fractional interests and hold them in trust for the tribe with jurisdiction over the property. 25 U.S.C. § 2212. Despite Congress's efforts, "interests in lands already allotted continued to splinter with each generation." 519 U.S. at 238.

PNM maintains, and the Court agrees, that at the time § 357 was enacted in 1901, Congress intended for all allotted land to be subject to condemnation for public purposes, even before the trust period ended and the land was patented in fee to the individual allottees. However, PNM asks the Court to go a step further and find that once Congress allotted land to

12

individual tribal members, the land remained subject to condemnation even after the land was reacquired in trust for a tribe under subsequent statutes. But PNM goes a step too far. PNM has not cited, and the Court has not located, a case holding that a parcel of land previously "allotted in severalty to" an individual Indian, but later transferred to the United States in trust for a tribe, is subject to condemnation under § 357 because the parcel is identified as an "allotment." And, PNM criticizes the one decision, *NPPD*, which held that such a parcel of land is not subject to condemnation under § 357.[7] Therefore, the Court did not clearly err in concluding that an interest in a previously allotted parcel of land later acquired in trust for a tribe was not condemnable under § 357.

PNM claims that the Court failed to define what it meant by "tribal lands," and the Court failed to explain how the Two Allotments became "tribal land" and ceased being "allotments." The Court followed the reasoning in *NPPD*, but to elaborate, the Court restates its conclusion: When all or part of a parcel of allotted land owned by one or more individuals is transferred to the United States in trust for a tribe; that land becomes "tribal land" not subject to condemnation under § 357. PNM correctly points out that there is no legal mechanism by which land can be characterized as partially allotted land and partially tribal land, and that is not what the Court has concluded. But, PNM's "once an allotment always an allotment" rule is not supported by any case law authority or the plain language of § 357 and its historical context.

As an alternative, PNM argues that "[t]he Court also has not identified any recognized legal classification or categorization that the Two Allotments could possess (other than "Allotments") in light of their continued majority beneficial-interest ownership by individual

---

[7] In *NPPD* Part II, the utility district argued that the future interests in an allotment conveyed to the Winnebago tribe should not constitute "tribal land." 719 F.2d at 961. However, relying on the definition of "tribal land" in the Part 169 regulations related to consensual easements, the Eighth Circuit stated, "by defining tribal land as 'any interest' in land, [tribal land] includes the undivided future interests or expectancies conveyed in this case." *Id.* at 962.

Indians." PNM would characterize the Two Allotments as condemnable "allotments" due to their majority ownership by individuals. By implication, the Two Allotments would not be condemnable only when a tribe acquires a majority beneficial interest in the land. Again, PNM cites no statutory authority or case law to support this alternative. According to PNM, the Court's ruling has created a new category of "tribal land," and may have adverse effects on the interests of individual fractional owners of the Two Allotments. In this case, however, the 22 Defendants, who constitute a majority of individual ownership interests in the Five Allotments, are aligned with the Nation and the United States in opposition to the Motion as they previously opposed condemnation. *See* 22 Defendants' Response (Doc. No. 116) (adopting Nations' Response and the United States' Response).

PNM's contention that once land was allotted, it could never regain its status as tribal land, is not persuasive in light of the shift in congressional policy in favor of tribal sovereign ownership. Upon review of the statutory history of allotted lands, the Court concludes that Congress facilitated the transfer of beneficial interests from individual land owners to tribes not only to reduce the fractionation of allotted lands among individuals but also to restore lands to protected tribal status.

C.   APPLYING THE PART 169 REGULATIONS

PNM next asserts, as it did in its Response to the Motion to Dismiss, that the Court should not follow *NPPD* because the Eighth Circuit incorrectly used the definition of "tribal land" set forth in the regulations governing consensual easements under 25 U.S.C. §§ 323–328. PNM cites *WBI Energy Transmission, Inc. v. Easement & Right-of-Way Across in Big Hom & Yellowstone Ctys., Montana*. WBI Energy Transmission, Inc. (WBI) held a 20 year consensual pipeline easement across several allotments owned by a single individual. No. CV 14-130-BLG-

SPW, 2015 WL 4216841, *1 (D. Mont. July 10, 2015). After failing to obtain the landowner's

consent to a renewal of the easement, WBI brought a condemnation action under 25 U.S.C. §

357 and under the Natural Gas Act, 15 U.S.C. §§ 717–717z. *Id.* The landowner filed a motion *in

limine* to preclude WBI "from arguing that its condemnation can be for more than 20 year term."

*Id.* at * 4. The landowner relied on 25 U.S.C. §§ 321 and 323 governing consensual easements,

and WBI argued that §§ 321 and 323 and the accompanying regulations were inapplicable to

condemnation.[8] The district court agreed with WBI and found that "condemnation provides an

alternative method to acquire the easement, WBI is not confined by the perimeters of § 321 or §

323." *Id.*

PNM asks the Court to follow the *WBI* court's reasoning and find that in this § 357

condemnation proceeding, PNM is not confined by the definition of "tribal land" from the Part

169 regulations. First, PNM mischaracterizes the Court's decision, which was not based solely

on the regulatory definition of "tribal land." Second, the holding in *WBI* does not convince the

Court to change its conclusion that  due to the Nation's ownership interest, the Two Allotments

are no longer "lands allotted in severalty to Indians" as provided in § 357. Moreover, even if the

Two Allotments were condemnable under § 357, Court would dismiss this action against the

Nation because it is an indispensable party that cannot be joined due to sovereign immunity.

Thus, the outcome would be the same.

Next, PNM takes issue with the Court's footnote discussion of cases that cited *NPPD*

with approval. (Mem. Op. at 14 n.16.) PNM argues that none of those courts directly approved of

Part II of the *NPPD* opinion and the use of the regulatory definition of "tribal lands." However,

---

[8] Section 321 authorizes the Interior Secretary to grant easements across Indian allotments for the construction of
pipelines provided that the easement "shall not extend beyond a period of twenty years." Section 323 authorizes the
Secretary to grant rights of way "subject to such conditions he may prescribe." Under the applicable regulations, a
new easement for a gas pipeline can be permanent, but easement renewals can be granted "for a like term of years."
25 C.F.R. §§ 169.18–169.19.

the first case cited by the Court did just that: "The Utility may be able to condemn land held in trust by the United States for the benefit of individual Indian allottees under 25 U.S.C. § 357, but this statute does not apply to land held in trust for the Tribe." *United States v. Pend Oreille Public Util. Dist. No. 1*, 28 F.3d 1544, 1552 (9th Cir. 1994) (citing *NPPD* 719 F.2d at 961). That subject was only discussed in Part II of the *NPPD* opinion. 719 F.2d at 961–62.

Nevertheless, PNM correctly maintains that the *Pend Orielle* court and the other cases cited in footnote 16 did not answer the question presented here as to whether land in which a tribe owns a fractional beneficial interest is exempt from § 357 condemnation. PNM correctly asserts that no court, other than the *NPPD* court and now this Court, have held that tracts of land that are jointly owned by individuals and a tribe may not be condemned under § 357. By the same token, however, no court has held that such land is condemnable under § 357. In sum, the Court, relying on the only Circuit Court of Appeals case that had decided this issue, did not commit clear error in holding that PNM cannot condemn the Two Allotments under the plain language of § 357.

D.   THE AMENDED PART 169 REGULATIONS

PNM contends that if the Court affirms its use of the definition of tribal lands from 25 C.F.R. § 169.1(d), the Court should reevaluate its findings in light of the amendments to the Part 169 regulations (Amended Part 169), which will become effective on March, 21 2016. As already mentioned, the Court did not decide that the Two Allotments were exempt from condemnation solely because they are tribal lands as defined in the Part 169 regulations. However, if the Court were to consider the Amended Part 169 regulations, the Court would not change its decision.

In June 2014, the BIA promulgated the amendments to "comprehensively update and streamline the process for obtaining BIA grants of rights-of-way on Indian land," and the BIA invited comments. *See* 79 Fed. Reg. 34,455-01 (June 17, 2014). PNM contends that the Amended Part 169 regulations, as amplified by the comments and the BIA's responses to the comments, support either of two conclusions: (1) that these regulations are not applicable to condemnation proceedings; or (2) that allotments jointly owned by a tribe and individuals should not be considered "tribal land" exempt from condemnation.

PNM's first argument is correct. The new regulations and the comments reaffirm that the Amended Part 169 regulations do not govern condemnation actions under § 357. For example, the old version of 25 C.F.R. § 169.21 stated:

> The facts relating to any condemnation action to obtain a right-of-way over individually owned lands shall be reported immediately by officials of the Bureau of Indian Affairs having knowledge of such facts to appropriate officials of the Interior Department so that action may be taken to safeguard the interests of the Indians.

The Amended Part 169 regulations omit this section apparently to remove any confusion about whether these regulations apply to § 357 condemnations.

In addition, one commenter asked the BIA why the term "eminent domain" was not defined in the amendments. The BIA responded: "the final rule does not include the term 'eminent domain' or address eminent domain, so this definition is not added. Statutory authority exists in 25 U.S.C. § 357 for condemnation under certain circumstances, but these regulations do not address or implement that authority." *See* Rights-of-Way on Indian Land; Final Rule, 80 Fed. Reg. 72,492, 72,495 (Nov. 19, 2015). The BIA further commented: "The current rule does not provide guidance for condemnation of Indian land. The statutory provisions at 25 U.S.C. § 357 govern this process." 80 Fed. Reg. at 72,517.

PNM contends these comments show that the BIA has discouraged the use of the regulatory definition of "tribal land" to interpret § 357. The Court, however, agrees with the United States' argument that although the Amended Part 169 regulations do not govern condemnation actions, the BIA's analysis and treatment of fractionated Indian lands is useful to interpret other Indian land statutes, particularly § 357.[9]

Alternatively, PNM argues that several of the Amended Part 169 regulations support a finding that the Two Allotments should not be considered "tribal land." For example, in Amended Part 169.2, the term "tribal land" is defined as "any tract in which the surface estate, or an *undivided interest in the surface estate*, is owned by one or more tribes in trust or restricted status." 25 C.F.R. § 169.2 (effective Mar. 21, 2016) (emphasis added). Conversely, the United States asserts that this new definition reveals that the Two Allotments would be considered tribal land. But, PNM points out that even though a fractional interest in land can be considered tribal land in § 169.2, the BIA does not treat "tribal land" and "individually owned land" as mutually exclusive legal classifications. For example, the BIA responded to a commenter who asked whether a tract in which both a tribe and an individual own interests would be considered "individually owned Indian land" or "tribal land:

> A tract in which both a tribe and an individual own interests would be considered "tribal land" for the purposes of requirements applicable to tribal land and would be considered "individually owned Indian land" for the purposes of the interests owned by individuals.

---

[9] In its Reply to the United States' Response, PNM argues that the United States should have explained the BIA's commentary on Amended Part 169, but instead, by remaining silent, the United States has essentially conceded PNM's position. (Reply (Doc. No. 118) at 4.) However, the United States made no concession. In its Response, the United States points to the definition of "tribal lands" in the Amended Part 169 regulations which include "an undivided interest in the surface estate." And the United States points to comments related to the definition of "tribal land" which included fractional interests in land owned by both individuals and tribes. (*Id.* 9–10.) The United States maintains that the new regulations and comments do not support a finding that the Court erred in its conclusion that lands jointly owned by a tribe are not eligible for condemnation.

*Id.* at 72,496. While BIA clearly recognizes the rights of both tribal and individual owners with regard to grants of easements, the BIA's treatment of jointly owned land does not convince the Court to change its decision. The Nation's joint ownership interest has an attendant right to possession of the entire tract, and the BIA recognizes that right:

> Comment—"Tribal Land": A tribal commenter asked whether a tract is considered tribal land, even if fractional interests are owned by both the tribe and individual Indians. Another commenter suggested defining "tribal land" to include only land that is not individually owned. A commenter suggested limiting tribal land to those tracts in which the tribe holds a majority interest.

> Response: Under the proposed definition and final definition, a tract is considered "tribal land" if any interest, fractional or whole, is owned by the tribe. *A tract in which both a tribe and individual Indians own fractional interest is considered tribal land for the purposes of regulations applicable to tribal land. If the tribe owns any interest in a tract, it is considered "tribal land" and the tribe's consent for rights-of-way on the tract is required under 25 U.S.C. 323 and 324.*

*Id.* at 72,497 (emphasis added). Also on that subject, some commenters opposed the BIA's requirement that an applicant get a tribe's consent to a right of way when a tribe owns a fractional interest "because a tribe could unilaterally stop other individual Indian landowners who have a majority interest from granting the right-of-way." *Id.* The BIA responded, "tribal consent is required for any tract in which the tribe owns an interest, regardless of whether the tribal interest is less than a majority. *Requiring tribal consent restores a measure of tribal sovereignty over Indian lands and is consistent with principles of tribal self-governance that animate modern Federal Indian policy.*" 80 Fed. Reg. at 72509 (emphasis added). The emphasized language exhibits the BIA's deference toward tribal ownership and tribal governance of land even when a tribe owns a small interest in the land. Given this deference to fractional tribal ownership, it is entirely reasonable to conclude in other contexts, like condemnation, that tribes who own a fractional interests in land should be treated with the equal deference.

19

In conclusion, the Court followed *NPPD* and its reliance on the Part 169 definition of "tribal land" only to amplify the Court's conclusion that the plain meaning of "lands allotted in severalty to Indians" excludes lands partially owned in trust for tribes. And, after examining the Amended Part 169 regulations and BIA commentary, particularly the BIA's deferential treatment of those lands, the Court stands by its interpretation of § 357. In view of the absence of case law authority in this circuit, the Court can appropriately borrow from the BIA's regulatory policy on Indian lands, to interpret the statute governing the condemnation of land.[10]

E.    DISMISSAL FOR FAILURE TO JOIN AN INDISPENSABLE PARTY UNDER RULE 19; THE COURT'S USE OF RULE 71.1; and *IN REM* PROCEEDINGS

If the Court sets aside its ruling and finds that PNM has the authority to condemn the Two Allotments, PNM still faces the Court's alternative ruling that the Two Allotments must be dismissed because the Nation is an indispensable party. In its Memorandum Opinion, the Court determined that under Rule 71.1(c)(1), all persons having an interest in property to be condemned must be joined as parties. (Mem. Op. at 11.) The Court cited Wright & Miller in support of this conclusion. *Id.* (citing 12 Fed. Prac. & Proc. § 3045). According to PNM, the Court should not have construed Rule 71.1's requirement that a plaintiff "must add as defendants all those persons who have or claim an interest" as a limitation on § 357's authorization of condemnation actions. In other words, PNM argues that the dismissal of indispensable parties

---

[10] PNM correctly points out that in § 357 Congress provided no statutory authority for a federal agency to interpret or limit its scope. (Resp. (Doc. No. 118) at 6). *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984) (discussing deference to an agency's construction of statute which agency administers and stating "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."). In contrast, the consensual easement statutes specifically authorize the Secretary to "prescribe any necessary regulations for the purpose of administering the provisions of sections 323 to 328 of this title." 25 U.S.C. § 328. However, the statutory scheme allowing consensual easements is relevant to the overall analysis of this case not only as to the reach of § 357 but also in determining under  Rule 19 that PNM has an adequate remedy apart from condemnation.

under Rule 19 and as persons with an interest in the property under Rule 71.1 does not mean that the Two Allotments must be dismissed.

PNM also contends that the Court should have cited a subsequent statement in the same section of Wright & Miller: "[S]ince the [condemnation] proceeding is in rem, there are no indispensable parties; the failure to join a party does not defeat the condemnor's title to the land, though the party will retain his or her right to compensation. . . ." *Id.* According to PNM since condemnation proceedings are strictly *in rem*, the dismissal of the Nation cannot deprive PNM of its authority to condemn an easement on the Two Allotments despite the strictures of Rule 19 and Rule 71.1.

In response, the Nation and the United States argue that this contention could have been raised earlier; therefore, it is an inappropriate basis for granting the Motion. However, in the interest of clarity, the Court will address PNM's *in rem* argument.

To begin with, the Court recognizes that a condemnation action generally is considered an *in rem* proceeding against property. *United States v. Petty*, 327 U.S. 372, 376 (1946) (stating in condemnation suit brought by United States that "[c]ondemnation proceedings are in rem."). However, the United States Supreme Court held that in § 357 condemnation proceedings against allotted Indian trust land, the United States is an indispensable party. *Minnesota*, 305 U.S. at 386. The Supreme Court further determined Congress had implicitly waived the United States' sovereign immunity by allowing suits against the United States to be brought in federal court. *Id.* at 388. Therefore, under § 357 a condemning authority cannot proceed against allotted land without joining the United States. *Id. See also Town of Okemah v. United States*, 140 F.2d at 965 (citing *Minnesota* and holding that United States was an indispensable party in a condemnation suit against individual allottees who owned land with restrictions on alienation). Consequently, a

federal condemnation proceeding under § 357 is not purely an *in rem* proceeding in which there are no indispensable parties.

In support of its contention, PNM cites two cases involving issues of sovereign immunity and condemnation under state law. First, *Cass County Joint Water Res. Dist. v. 1.43 Acres of Land in Highland Twp.*, 2002 N.D. 83, 643 N.W. 2d 685 (2002), was a case in which an individual transferred fee title to the subject land to an Indian tribe in order to thwart a public works project. The North Dakota Supreme Court recognized an issue of first impression: "May a state condemn land within its territorial boundaries which has been purchased in fee by an Indian tribe, but which is not reservation land, aboriginal land, allotted land, or trust land?" *Id.* at 688. The court started with the premise that a condemnation proceeding under North Dakota law is strictly *in rem* and as such, *in personam* jurisdiction over a party is not required. *Id.* at 689. After determining that the proceeding met the due process requirements: (1) there were minimum contacts between the party and the forum state, and (2) all property owners had been given notice as required under state law, *id.* at 690, the Court allowed the condemnation to go forward:

> The State, and the District acting on behalf of the State, has broad authority to acquire property located within its territorial jurisdiction to be used for public purposes. A condemnation action is purely in rem, and does not require acquisition of in personam jurisdiction over the owners of the land. . . .
>
> The land at issue in this case is essentially private land which has been purchased in fee by an Indian tribe. It is not located on a reservation, is not allotted land, is not part of the Tribe's aboriginal land, is not trust land, and the federal government exercises no superintendence over the land. Under these circumstances, the State may exercise territorial jurisdiction over the land, including an in rem condemnation action, and the Tribe's sovereign immunity is not implicated.

643 N.W.2d at 693.

The *Cass County* ruling is distinguishable in key ways. First, the power to condemn under § 357 does depend on *in personam* jurisdiction as the Supreme Court held in *Minnesota*. In

22

addition, the Two Allotments are allotted trust land and the federal government and the Nation,

exercise "superintendence over the land." *Id.* And since the Nation's sovereign immunity has not

been abrogated, the Court cannot go forward without *in personam* jurisdiction over the Nation.

The second case is *State of Georgia v. City of Chattanooga*, 264 U.S. 472, 482 (1923). In

that case, the City of Chattanooga, Tennessee filed a condemnation action against property

within the City that was owned by the State of Georgia and operated as a railroad yard. Georgia

argued that the City could not sue for condemnation due to Georgia's sovereign immunity. The

Supreme Court disagreed:

> Having divested itself of its sovereign character, and having taken on the
> character of those engaged in the railroad business in Tennessee . . ., [Georgia's]
> property there is as liable to condemnation as that of others, and it has, and is
> limited to, the same remedies as are other owners of like property in Tennessee.
> The power of the city to condemn does not depend upon the consent or suability
> of the owner. Moreover, the acceptance by Georgia of the permission given it to
> acquire the railroad land in Tennessee is inconsistent with an assertion of its own
> sovereign privileges in respect of that land and precludes a claim that it is not
> subject to taking for the use of the public, and amounts to a consent that it may be
> condemned as may like property of others.

*Id.* at 482–83 (citations omitted). The Supreme Court further noted that Georgia had been given

notice and could voluntarily appear, but otherwise Georgia "had a plain, adequate, and complete

remedy in the condemnation proceedings. . . ." *Id.* at 483.

PNM argues that the Court should follow the reasoning in these cases and find this action

is an *in rem* proceeding that may proceed despite the absence of the Nation as a party. However,

in *Cass* the land was subject to state condemnation proceedings because the tribe owned

unrestricted land in fee that was not part of a reservation or an allotment. Land owned by a tribe

in fee is subject to condemnation and taxation under state law. *See* 25 U.S.C. § 349; *and County

of Yakima*, 502 U.S. at 267 (concluding that fee patented land on a reservation was subject to

state ad valorem tax). In *Georgia*, the Supreme Court was considering land owned by a

23

sovereign state in its proprietary capacity, not in its sovereign capacity. And, the Supreme Court held that in its proprietary capacity, Georgia had consented to be sued as any other private land owner. Here, the Nation owns the Two Allotments in a sovereign capacity, and did not implicitly consent to suit by acquiring an interest in the property. Thus, neither case persuades the Court that this proceeding can continue as an *in rem* proceeding against the Two Allotments despite the Nation's absence.

F.    NATION'S SOVEREIGN IMMUNITY CAN BE DISTINCT FROM<br>THAT OF THE UNITED STATES

PNM points to the Tenth Circuit's opinion in *Somerlott v. Cherokee Nation Distr., Inc.*, where the Tenth Circuit recognized that tribal sovereign immunity is co-extensive with the United States' sovereign immunity 686 F.3d 1144, 1149–50 n.3 (10th Cir. 2012). PNM admits, however, that despite this general rule, a congressional waiver of the United States' sovereign immunity does not *per se* result in a waiver of tribal sovereign immunity. *See Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 n.14 (10th Cir. 1982) (noting that United States' and tribal immunity are generally coextensive, and stating, "[o]f course, this is not to say that where Congress waives the United States' immunity it implicitly waives the immunity of Indian tribes also."). PNM asks the Court to consider the holding in *Wagoner County Rural Water Dist. No. 2 v. United States*, No. 07 CV 0642-CVE-PJC, 2008 WL 559437, *2 (N.D. Okla. Feb. 26, 2008). In *Wagoner County*, four water districts, a nonprofit corporation, and a private nursery brought an action against the Grand River Dam Authority, the United States, and the Cherokee Nation seeking a declaration of the parties' rights to water impounded in a reservoir. *Id.* The plaintiffs asked the court to find that both the United States' and the Cherokee Nation's sovereign immunity had been waived in the McCarran Amendment. *Id.* In the McCarran Amendment, 43

U.S.C. § 666(a), Congress permitted parties to join the United States as a defendant in an

adjudication of certain water rights. *Id.* The district court held

> [T]he United States Supreme Court has held that the McCarran Amendment "did
> not waive the sovereign immunity of [American-]Indians as *parties* " to lawsuits
> brought under the Amendment. The McCarran Amendment waived sovereign
> immunity only with respect to the reserved water rights of the United States,
> which include those *rights* reserved on behalf of certain American-Indian tribes.
> Here, the United States waiver of immunity under the Amendment does not
> automatically extend to the Cherokee Nation simply because both entities possess
> coextensive sovereignty.

*Id.* (emphasis in original) (citations omitted). PNM argues that, unlike *Wagoner County*,

Congress expressly authorized condemnation of "lands allotted in severalty to Indians," which

should be interpreted as an authorization of *in rem* actions against allotments. PNM asserts that,

as a result, the implicit waiver of United States' sovereign immunity recognized by the Supreme

Court in *Minnesota* should extend to the Nation. According to PNM, a holding otherwise would

place more importance on the Nation's sovereign immunity above that of the United States with

respect to allotted lands.

However, the Supreme Court in *Minnesota* did not seem to consider the *in rem* nature of

a condemnation proceeding. The State of Minnesota had argued that it had power to condemn the

allotted lands under § 357 without making the United States a party based on the state's authority

given by a treaty and its sovereign capacity to exercise its governmental functions. *Id.* at 385.

The Supreme Court responded with a two-part analysis. First, the Supreme Court concluded that

"[t]he United States is an indispensable party defendant to the condemnation proceedings. A

proceeding against property in which the United States has an interest is a suit against the United

States." 305 U.S. at 386. Second, the Supreme Court found that under § 357 the "authorization to

condemn confers by implication permission to sue the United States. But Congress has provided

generally for suits against the United States in the federal courts. . . . This suit was begun in state

court." *Id.* at 388. The Supreme Court upheld the dismissal of the action removed from state

court "although in a like suit originally brought in a federal court it would have had jurisdiction."

*Id.* at 389. The Court cannot find support within *Minnesota* or its progeny for a finding that

Congress's authorization to condemn allotted lands conferred by implication permission to sue a

tribe. In addition, no court has held that a congressional waiver of the United States' immunity

for certain suits in federal court can be applied with equal force to a tribe.

Hence, PNM's argument that this *in rem* condemnation action can proceed against the

Two Allotments despite the absence of the Nation directly contradicts the Supreme Court's

ruling in *Minnesota*. If the Supreme Court viewed § 357 condemnations as purely *in rem*

proceedings, it would not have considered the United States an indispensable party. Moreover,

no court has held that even though the United States is an indispensable party to a § 357 action, a

tribe, as a joint owner, is not a required or indispensable party. And, more importantly, although

the Supreme Court in *Minnesota* found that Congress had waived the United States' sovereign

immunity, no court has applied the same implicit waiver to a tribe under § 357.[11] In fact, it is

doubtful that Congress intended, even implicitly, to waive tribal sovereign immunity in § 357

because at the time § 357 was enacted, Congress intended to parcel out all tribal reservation and

communal property to individuals. On a related note, PNM has cited no authority holding that a

tribe with beneficial title to land need not be joined in a condemnation action if the fee owner,

the United States, is properly joined.

---

[11] In the Memorandum Opinion, the Court recognized that the holding in *Minnesota* on the implicit waiver of the United States' sovereign immunity has been criticized and that the Tenth Circuit has refused to apply the same reasoning in a partition action against Indian lands. (*See* Mem. Op. at 16–17, citing *Prince v. United States*, 7 F.3d 968, 970 (10th Cir. 1993)).

G.   NO MANIFEST INJUSTICE AND PNM HAS AN ADEQUATE REMEDY APART FROM CONDEMNATION

PNM contends that if the Court's holding "were to become controlling law in the Tenth Circuit, such a decision would result in manifest injustice to PNM and its customers, and would also have far reaching, negative effects throughout Indian Country." (Mot. at 17.) PNM asserts that a tribe could acquire a miniscule ownership interest in allotted lands and block all condemnations for public purposes. PNM quotes the North Dakota Supreme Court:

> The decision of the district court (that there was no jurisdiction of a condemnation as to fee patented lands) would have far-reaching effects on the eminent domain authority of states and all other political subdivisions. Indian tribes would effectively acquire veto power over any public works project attempted by any state or local government merely by purchasing a small tract of land within the project.

*Cass County* 643 N.W.2d at 694. PNM also contends that the effects of this Court's ruling are even more pronounced in light of the Amended Part 169 regulations requiring an easement applicant to get the consent of a tribe who holds even a small fractional interest in a parcel of land. *See* 25 C.F.R. § 169.3 (effective Mar. 21, 2016). PNM maintains that if the requisite consent from both the tribe and a majority of individual owners is not attainable, then it will have no alternative remedy under the condemnation statute. PNM contends that this Court's ruling opens up an avenue for abuse if a tribe wishes to block a project or if a tribe requests unreasonable payment in compensation. PNM asserts that in light of that possibility, utility companies and governmental entities will avoid building public works projects on Indian lands. PNM submits that the Court's holding will stand in the way of the BIA's stated policy of attracting economic development to Indian lands because increased project costs will impede a tribe's ability to attract non-Indian investment to Indian lands. *See generally*, 80 Fed. Reg. 72,505–72,506 (Nov. 19, 2015).

The Court recognizes and has certain sympathy with the policy arguments that PNM makes. However, it cannot have escaped notice by tribal officials and allotment land owners that they must cooperate in the granting of access to tribal lands to encourage investment in those lands. More importantly, this is the incorrect forum to address PNM's concerns. *County of Yakima*, 502 U.S. at 265 (noting the Yakima Nation's arguments about the implications of the court's rulings were more appropriately made to Congress). It is Congress's job to consider and correct the negative effects of its laws.

In a related argument, PNM maintains that it cannot acquire a consensual easement because the 22 Defendants have informed PNM and this Court in a filing in a related trespass case that they "refuse to provide consent to the required easements." *See Barboan et al. v. PNM*, No. 15 CV 826 WPJ/KK, Plaintiffs' Response to Nominal Defendant United States of America's Motion to Dismiss This Action in Its Entirety (Doc. No. 23) at p. 5. PNM argues that the Court should not have found that PNM has an adequate remedy in the Court's Rule 19 analysis.

The Nation responds that PNM ignores the possibility that it can negotiate with the owners of the Two Allotments for a higher compensation or other consideration for its easement. (Nation's Resp. To Mot. at 8.) Alternatively, the Nation argues that PNM's inability to sue for condemnation is a recognized consequence in cases against sovereigns. Moreover, the lack of a remedy, as in this situation, should be given less weight in a Rule 19 analysis involving sovereigns. As a general rule, dismissal due to an absent sovereign even in the absence of a remedy "is contemplated by the doctrine of sovereign immunity." *Republic of the Philippines v. Pimentel*, 553 U.S. 851, 872 (2008). In essence, the Nation asserts that the lack of a remedy is a natural result of the sovereign immunity doctrine and should not be dispositive in the Rule 19 analysis.

28

The United States counters that PNM's conclusion that it has no adequate remedy is premature because PNM has not presented evidence that a negotiated easement is absolutely impossible. PNM has presented no evidence that it has contacted counsel for the Nation or the 22 Defendants in an effort to negotiate a consensual easement.

The Court recognizes that the legal situation faced by PNM is not of its own making. In fact, Congress created this situation by allowing lands previously allotted to individuals to be reacquired in trust for tribes without amending § 357. It is up to Congress, not this Court, to open up the condemnation avenue over trust lands fractionally owned by tribes.

## H.    PROSPECTIVE APPLICATION

PNM asks the Court to apply the ruling prospectively due to the significant injustice to PNM and its rate payers. Generally speaking, the law announced in a court's decision controls the case at bar. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 608 (1987). However, courts have restricted rulings to prospective application in specific circumstances that go beyond the particular hardship incurred when a party does not prevail. *Chevron Oil. Co. v. Huson*, 404 U.S. 97, 106–07 (1971). Three factors guide the Court in determining whether to apply a ruling prospectively. First the Court examines whether the decision establishes "a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Id.* Second, the Court determines whether, given the history, purpose and effect of the decision, retroactive application will further or retard its operation. Third, the Court analyzes whether retroactive application of the new rule "could produce substantial inequitable results." *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1494 (10th Cir. 1991).

1.      New Principle of Law

PNM maintains that at the time it obtained the Original Easement in the 1960s, it was "well-settled federal law that PNM could, if necessary, condemn easements on the affected Allotments if PNM was unable to successfully negotiate right-of-way renewals." (Mot. at 23.) According to PNM, Congress, in 1983 and later in 2000, did not send a signal, "that § 357 condemnation rights were in any way affected by the ILCA or any ILCA-authorized tribal acquisitions of fractional beneficial interests." (*Id.*) PNM maintains that in 2009, when it began seeking a renewal of its Original Easement, "PNM reasonably relied on long-settled federal law and made substantial investment-backed expectations based on that reliance." (*Id.*) However, the Eighth Circuit's ruling in *NPPD* occurred in 1983, and the primary treatise on Indian law recognized that ruling. In Cohen's Handbook on Federal Indian Law, condemnation is only discussed in the chapter on "individual Indian property." And Cohen's Handbook states that § 357 "authorizes condemnation of '[l]ands allotted in severalty to Indians,' but does not authorize condemnation of any tribal interests in allotments[.]" Cohen, § 16.03[4][d] n.170. And as discussed above, no court, prior to or after *NPPD*, has held that a condemning authority has the right under § 357 to condemn land owned by the United States in trust for both individuals and tribes. Courts have only allowed condemnation of lands owned by tribes in fee under state law. As argued by the Nation, sovereign immunity is a long-settled doctrine, and PNM could not have been surprised to learn that the Nation would oppose this action against it on those grounds. The first factor does not weigh in PNM's favor.

2.      Retroactive Application Will Further the Purpose of the Law.

The second factor requires an examination of the purpose behind the decision at issue and whether prospective application will "unduly undermin[e] the 'purpose and effect' of the new

rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 94–95 (1993). If this decision applies

prospectively, that is, only to new public works projects as PNM requests, then the purpose and

effect of this decision will certainly be undermined.

3.      Retroactive Application Would Not Produce Substantial
Inequitable Results.

PNM asserts that under this ruling it will be required to pay substantial sums to either

remove or reroute the AY Line or to satisfy the individual owners and the Nation. In any event,

PNM will be required to incur and pass along to its rate payers the costs of this easement

acquisition that "Congress never intended public utilities or their ratepayers to bear." (*Id.* at 24.)

The Court agrees with the Nation's and the United States' counter arguments. The Nation

argues that PNM fails to explain how in the pursuit of a renewed easement, PNM "reasonably

relied on long-settled federal law and made substantial investment-backed expectations based on

that reliance." The United States asserts that the easements involved in this case cover a small

part of the AY Line. PNM has worked with the Nation on access rights related to the entire AY

Line, and PNM has agreed to pay adequate consideration. The United States contends that

fractional interests and what to do with them has been an issue for over seventy years and is

nothing new; therefore, PNM should not claim surprise at this situation. The Nation has the

power to deal with its land as it sees fit, and PNM's request for prospective application is

contrary to the history of legal precedent and of precedent regarding tribal sovereign immunity.

PNM has not presented a persuasive argument to this Court that the ruling here should be made

prospective.

I.      CERTIFICATION FOR INTERLOCUTORY APPEAL

To certify a question for interlocutory appeal, the Court must determine that the

Memorandum Opinion and Order "involves a controlling question of law as to which there is

31

substantial ground for difference of opinion and that an immediate appeal from the order may

materially advance the ultimate termination of the litigation. . . ." 28 U.S.C. § 1292(b). The Court

of Appeals may, in its discretion, "permit an appeal to be taken from such order, if application is

made to it within ten days after the entry of the order[.]" *Id.* However, an application for an

appeal does not stay proceedings in the district court "unless the district judge or the Court of

Appeals or a judge thereof shall so order." *Id.* PNM contends that if the Court does not amend or

set aside its Memorandum Opinion, the Court should certify the ruling for interlocutory appeal.

PNM states that there are "controlling issues of law" concerning "whether Section 357

authorizes a condemnation action against an Allotment in which a tribe holds a fraction of the

beneficial interest." (Mot. at 25.) The Court agrees that this case involves controlling issues of

law that present "substantial ground for difference of opinion." Even though the Court followed

the Eighth Circuit's lead in *NPPD*, the only case on the interpretation of § 357 in this context,

there are no cases within this circuit on this issue. Moreover, cases involving statutory

interpretation are well suited for interlocutory appeal. The phrase "question of law" as used in 28

U.S.C. § 1292(b) "has reference to a question of the meaning of a statutory or constitutional

provision, regulation, or common law doctrine." *Branzan Alternative Investment Fund, LLLP v.*

*The Bank of New York Mellon Trust Company, N.A.*, No. 14-cv-02513-REB-MJW, 2015 WL

6859996, *1 (D. Colo. Nov. 9, 2015) (unreported). Such questions typically involve law that is

unsettled. *Id.* Consequently, for the purposes of 28 U.S.C. § 1292(b), district courts should

certify questions when they are unsure what the law is, not when there is merely a dispute as to

how the law applies to the facts of a particular situation. *Id.* Hence, the Court finds that there are

controlling questions of law as to which there is substantial ground for difference of opinion, and

there is no clear precedent on which to rely.

In addition, an interlocutory appeal will materially advance the ultimate termination of this proceeding. If interlocutory appeal is denied, PNM will have to condemn the other three Allotments; and if PNM then successfully appeals this ruling, it will have to repeat the condemnation process for the Two Allotments. If, however, PNM loses the appeal, it may have to change the location of its transmission line to bypass the Two Allotments. It is more efficient, therefore, to allow appeal at this time. The Court will certify for interlocutory appeal the following questions:

I.      Does 25 U.S.C. § 357 authorize a condemnation action against a parcel of allotted land in which the United States holds fee title in trust for an Indian tribe, which has a fractional beneficial interest in the parcel.

II.     Is an Indian tribe that holds a fractional beneficial interest in a parcel of allotted land a required party to a condemnation action brought under 25 U.S.C. § 357?

III.    Does an Indian tribe that holds a fractional beneficial interest in a parcel of allotted land have sovereign immunity against a condemnation action brought under 25 U.S.C. § 357?

IV.     If an Indian tribe that holds a fractional beneficial interest in a parcel of allotted land has sovereign immunity against, and cannot be joined in, a condemnation action brought under 25 U.S.C. § 357, can a condemnation action proceed in the absence of the Indian tribe?

J.      SEVERANCE AND FINAL JUDGMENT

Under Rule 21, "[t]he court may . . . sever any claim against any party." Fed. R. Civ. P. 21. "[W]here certain claims in an action are properly severed under Fed. R. Civ. P. 21, two separate actions result." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1519 (10th Cir. 1991). A court may sever claims under Rule 21, if the two claims are "discrete and separate," i.e., one claim must be capable of resolution despite the outcome of the other claim. After severance, a court may render a final, appealable judgment in one of the two severed actions notwithstanding the continued existence of unresolved claims in the other. *Gaffney v.*

33

*Riverboat Servs. Of Indiana*, 451 F.3d 424, 441–42 (7th Cir. 2006) (holding that the plaintiffs' severed claims against one defendant reached final decision, thereby vesting jurisdiction in circuit court).

As an alternative to interlocutory appeal, PNM asks the Court to sever its claims against the Two Allotments and enter a final judgment so that PNM may appeal the Court's Memorandum Opinion. In addition to the Nation, Defendants Lorraine J. Barboan, Laura H. Chaco, Benjamin A. House, Mary R. House, Annie H. Sorrell, and Dorothy W. House are owners of fractional beneficial interests in Allotment 1160. Defendants Leonard Willie, Irene Willie, Charley Johnson, Eloise J. Smith, and Shawn Stevens are owners of fractional beneficial interests in Allotment 1392 along with the Nation. Thus, PNM asks the Court to sever its condemnation claims against the Nation and 11 of the individual defendants. Other than PNM's desire to appeal the Court's dismissal, there is no reason to sever the claims against the Two Allotments. Even though a severance would allow this condemnation action to go forward as to the other three allotments, the Court has concluded it is better to stay those claims pending the resolution of PNM's interlocutory appeal. Since the Court is granting PNM's request for certification of an interlocutory appeal, the Court will deny without prejudice PNM's request for severance.

IT IS ORDERED that:

1.      PLAINTIFF PUBLIC SERVICE COMPANY OF NEW MEXICO'S MOTION TO ALTER OR AMEND ORDER DISMISSING THE NAVAJO NATION AND ALLOTMENT NUMBERS 1160 AND 1392 OR IN THE ALTERNATIVE MOTION FOR INTERLOCUTORY CERTIFICATION OR SEVERANCE OF CASE (Doc. No. 107)

    a.    is denied in part, and the Court will not alter or amend the Memorandum

        Opinion or set aside the Order of Dismissal;

    b.    is denied in part, and the Court will not sever PNM's claims against the

        Two Allotments;

    c.    is granted in part, and the Court certifies for interlocutory appeal the

        controlling issues of law outlined above; and

  2.    All claims in this case are stayed pending the resolution of the interlocutory

appeal.

_____

SENIOR UNITED STATES DISTRICT JUDGE